69 Mass. App. Ct. 243 (2007)      243

United States Gypsum Company *v.* Executive Office of Environmental Affairs.

UNITED STATES GYPSUM COMPANY & others[1] *vs.* EXECUTIVE
OFFICE OF ENVIRONMENTAL AFFAIRS & others.[2]

No. 06-P-169.

Suffolk. December 4, 2006. - June 4, 2007.

Present: PERRETTA, LAURENCE, & GRASSO, JJ.[3]

*Harbors. Real Property,* Harbors, Restrictions. *Administrative Law,* Agency's
authority, Regulations, Substantial evidence. *Regulation. Constitutional
Law,* Taking of property. *Office of Coastal Zone Management.*

In reviewing a decision of the director of the Office of Coastal Zone Manage-
ment (OCZM) that effectively adopted the conclusions and recommenda-
tions of a boundary review performed by the OCZM to determine whether
certain properties should remain within a designated port area (DPA) or be
removed therefrom, a Superior Court judge erred in upholding the
director's decision to exclude two particular properties from the DPA,
where such an exclusion was in excess of the director's authority under the
applicable regulations and at odds with the overarching public policy
[248-254], and where the decision was not supported by substantial
evidence [254-257]; however, the judge correctly concluded that there was
more than substantial evidence in the administrative record establishing
that a third property met the regulatory criteria for continued inclusion
within the DPA [257-258] and that such inclusion did not constitute an
unconstitutional regulatory taking [258-260].

CIVIL ACTIONS commenced in the Superior Court Department
on January 15, 2003.

After consolidation, the case was heard by *Ralph D. Gants,*
J., on motions for summary judgment and for judgment on the
pleadings.

*Susan E. Stenger* for United States Gypsum Company.

[1]LaFarge North America, Inc.; Conservation Law Foundation; and Donato
Pizzuti, as trustee of the CCC Realty Trust.

[2]Office of Coastal Zone Management; Thomas W. Skinner, as director thereof;
John J. Flatley and Gregory D. Stoyle, as trustees of Schraffts Nominee Trust
and as trustees of 465 Medford Street Trust; and Michael J. Rauseo, as trustee
of Suffolk Medford Realty Trust.

[3]Justice Laurence participated in the deliberation on this case and authored
the opinion prior to his retirement.

*Edward T. Patten* for LaFarge North America, Inc.

*Benjamin J. Ericson,* Assistant Attorney General, for Executive Office of Environmental Affairs & others.

*Daniel P. Dain* for John J. Flatley & another.

*Gerald J. Caruso* for Donato Pizzuti.

LAURENCE, J. *Background.* To promote the appropriate uses of scarce coastal resources consistently with the Federal Coastal Zone Management Act (16 U.S.C. §§ 1451 et seq.),[4] the Massachusetts Office of Coastal Zone Management (OCZM)[5] has since 1978 promulgated designated port area regulations governing the primary working waterfronts within Massachusetts's developed coastal harbors. The declared purpose of such designations is "the promotion of . . . water-dependent industrial uses," pursuant to the following objectives set forth in 301 Code Mass. Regs. § 25.01(2) (1994):

> "[W]hat remains of the industrialized coast should be preserved to the maximum extent practicable in order to meet the long term, cumulative space needs of the water-dependent industries which these areas are so well-suited to accommodate. As a matter of state policy, it is not desirable to allow these scarce and non-renewable resources of the marine economy to be irretrievably committed to, or otherwise significantly impaired by, non-industrial or nonwater-dependent types of development which enjoy a far greater range of locational options.

> "Accordingly, within [designated port areas] it is the intent of the [coastal zone management] Program to encourage water-dependent industrial use and to prohibit, on tidelands subject to the jurisdiction of [G. L.] c. 91, other uses except for compatible public access and certain industrial, commercial, and transportation activities that

---

[4]Those uses are identified in the "purpose" section of the coastal zone management program's designation of port areas regulations as "commercial fishing, shipping, and other vessel-related activities associated with waterborne commerce, and . . . manufacturing, processing, and production activities reliant upon marine transportation or the withdrawal or discharge of large volumes of water." 301 Code Mass. Regs. § 25.01(2) (1994).

[5]The OCZM was established by G. L. c. 21A, § 4A, as an agency within the Executive Office of Environmental Affairs to implement the coastal zone management program for Massachusetts.

can occur on an interim basis without significant detriment to the capacity of [designated port areas] to accommodate water-dependent industrial use in the future."

*Administrative proceedings.* The present controversy involves the Mystic River designated port area in Charlestown (the DPA), whose boundaries were designated in 1978. It arises from the petitions of the owners of five properties in the DPA[6] (all seeking to develop their properties for nonwater-dependent uses, notably residential condominium complexes), who requested that OCZM conduct what is known as a "boundary review" to determine whether their lands should remain within the DPA or be removed therefrom.[7] After completing the requested boundary review, OCZM issued its decision in a boundary review dated October 9, 2002, which concluded that the Schrafft Center at 529 Main Street should no longer continue to be included within the DPA[8]; that the other four properties all met the designation standards set forth in the regulations for remaining in the DPA; that two of those properties, 425 Medford Street and the Charlestown Commerce Center (the CCC) at 30-50 Terminal Street, should remain in the DPA; but that 465 Medford Street and the Nancy Sales property at 261-287 Medford Street should be excluded from the DPA upon the owners' satisfactory compliance with certain specified conditions.[9] On December 16, 2002, the director of OCZM (director) (charged under the regulations with making the final

---

[6]The five properties were the Schrafft Center at 529 Main Street, and 425 and 465 Medford Street, title to each of which was held in a separate nominee trust by trustees John Flatley and Gregory Stoyle (the Flatley trustees); the Nancy Sales property at 261-287 Medford Street, owned by Michael Rauseo as trustee of Suffolk Medford Realty Trust; and the Charlestown Commerce Center (the CCC) at 30-50 Terminal Street, owned by Donato Pizzuti, trustee of CCC Realty Trust.

[7]The "Designation Procedures" for such review are found in 301 Code Mass. Regs. § 25.03 (1994), and the "Designation Standards" are contained in 301 Code Mass. Regs. § 25.04 (1994).

[8]The owners of the Schrafft Center, the Flatley trustees, successfully moved to dismiss subsequent court challenges to its exclusion from the DPA (discussed below) on standing grounds, a decision no party complains of by appropriate appellate argument.

[9]As discussed in greater detail, *infra*, OCZM concluded, in essence, that a "fundamental problem" facing the DPA was heavy truck traffic on the narrow Medford Street, which irritated the Charlestown neighborhood and was inefficient for the industrial users. A solution proposed as early as 1990 was

determination) effectively adopted the conclusions and recommendations of the boundary review as his designation decision.

*Proceedings below.* That decision triggered three separate suits that were consolidated in Superior Court. United States Gypsum Company (Gypsum), owner of 200 Terminal Street,[10] and LaFarge North America, Inc. (LaFarge), owner of 285 Medford Street (both located within the DPA), brought essentially identical complaints seeking reversal of the conditional exclusion from the DPA of 465 Medford Street and the Nancy Sales property, on the grounds that the director exceeded his authority in excluding those properties and that his decision was not supported by substantial evidence.[11] The complaint of Donato Pizzuti, as trustee of the realty trust that owned the CCC, demanded the same relief as the other plaintiffs but also sought a boundary review leading to exclusion of the CCC from the DPA; challenged, as a deprivation of due process, the denial of an exclusion for the CCC in the proceedings under review; and asserted that the CCC's continued inclusion in the DPA constituted a regulatory taking.

In a lengthy decision (on review under G. L. c. 30A), a Superior Court judge specially assigned to hear the consolidated actions denied Gypsum's and LaFarge's respective motions for summary judgment and Pizzuti's motion for judgment on the pleadings,[12] and allowed the defendants' cross-motions for judgment on the pleadings and summary judgment. Concluding that

---

construction of a new industrial roadway to deliver truck traffic to Sullivan Square on a corridor to be built over the land of the Flatley trustees. OCZM saw the exclusion of 465 Medford Street and the Nancy Sales property as increasing the likelihood, by enlisting their owners' cooperation, that the corridor would be built. The conditions were, basically, that the Flatley trustees would grant an easement over their properties to accommodate the new corridor and that the owners of both properties would share the significant expense of an engineering and design study for the roadway.

[10]In light of the judge's decision on standing with respect to the Schrafft Center (see note 8, *supra*), it is difficult to see what standing Gypsum, a non-abutter, had to complain about the decision to exclude other properties from the DPA in the absence of a requisite showing of aggrievement, compare *Butler* v. *Waltham,* 63 Mass. App. Ct. 435, 440 (2005); but no party has raised, much less argued, the point on appeal, and we cannot address it on an insufficient record.

[11]The Conservation Law Foundation was allowed to intervene as a party and argued the same point as Gypsum and LaFarge.

[12]Because the answers denied material allegations in Pizzuti's complaint and raised affirmative defenses, and because Pizzuti's motion presented mat-

the director of OCZM had discretion so to act, the judge rejected the plaintiffs' arguments that the director exceeded his authority in excluding 465 Medford Street and the Nancy Sales property from the DPA; that the designation decision was not supported by substantial evidence[13]; and that it should be reversed to the extent that it excluded those properties once the conditions imposed by the director were met.[14]

On appeal, Gypsum presses its contention that the director

ters outside the pleadings, his motion was effectively addressed and disposed of as provided in Mass.R.Civ.P. 56, 365 Mass. 824 (1974). See Mass.R.Civ.P. 12(c), 365 Mass. 754 (1974). No argument is made on appeal that the judge applied incorrect procedural standards in deciding the various motions.

[13]The parties debated below, and the judge carefully considered, whether the designation decision was regulatory and thus reviewable under the arbitrary and capricious standard, or adjudicatory and subject to review by the substantial evidence test. See *Sierra Club* v. *Commissioner of the Dept. of Envtl. Mgmt.*, 439 Mass. 738, 745-749 (2003). The judge applied the substantial evidence test, and no party argues on appeal that any other standard applies, although Pizzuti discusses both.

[14]The judge held that the director's decision had been both within his discretion and reasonable:

> "It was reasonable for the Director to conclude that the construction of this industrial roadway was essential to the long-term economic health of the DPA. It was also reasonable for him to conclude that, despite the apparent need, little progress was being made towards its construction. The Director, adopting the findings of the Boundary Review, essentially found that public funds for the construction of the roadway were unlikely until three issues were resolved: (1) a state agency must purchase the rights to the rail line; (2) the transportation corridor must be studied and designed; and (3) the Flatley Trusts must allow the corridor to be built over their land. Finding that the first issue was already being addressed by the Commonwealth and Massport, [the Director] essentially traded the DPA designation of 465 Medford Street and the Nancy Sales Property in order to resolve the latter two issues. As a condition of being excluded from the DPA, the owners of these two properties were required to pay for an engineering study, design, and plans for the construction of the new roadway and the Flatley Trusts were required to grant rights over their properties at 425 and 465 Medford Street and the Schrafft Center to accommodate the new roadway.

> "Reasonable persons may differ as to whether the Director was wise to have made this trade without any commitment of public funds to build the roadway. . . . [T]he substantial evidence standard does not require that the Director have made the best possible trade or pursued the wisest strategic course. It is enough that he rendered a reasonable decision based on the evidence available to him. Here, *there is evidence to support the Director's conclusion that the conditions he extracted from the*

had no discretion and no authority to exclude the two properties from the DPA and that the decision to do so lacked substantial evidence. LaFarge, focusing only on the Nancy Sales property (contiguous to its own), argues that the decision to exclude it was unsupported by substantial evidence. Intervener Conservation Law Foundation maintains that the director lacked any discretion to remove or exclude properties from the DPA, and that his decision subverts the purpose of the OCZM regulations. Pizzuti has pressed all of his arguments, including denial of due process and regulatory taking.[15]

We agree with the plaintiffs that the exclusion of 465 Medford Street and the Nancy Sales property from the DPA was in excess of the director's discretionary authority under the regulations and was unsupported by substantial evidence, but we affirm the director's decision as to all claims raised regarding the CCC.

*Discussion.* 1. *The director's authority.* We acknowledge the familiar, frequently applied standard governing judicial review of an agency's interpretation of the regulations it administers: the agency's reasonable interpretation of its own rule is entitled

> *owners of 465 Medford Street and the Nancy Sales Property significantly increased the likelihood that the critical industrial roadway would be built sooner rather than later, and that the remaining business in the DPA would economically be healthier in the long run as a result"* (emphasis added).

As to Pizzuti's separate due process and taking claims, the judge concluded that there was also substantial evidence to support the designation decision that the CCC remain in the DPA; that there had been no denial of Pizzuti's due process rights; and that Pizzuti was seeking an end run around the strictures of administrative review by seeking a de novo evidentiary hearing on the issue of inclusion of the CCC in the DPA, but had not demonstrated a regulatory taking. See part 3, *infra.*

[15]We take judicial notice of the fact that, subsequent to the submission of briefs in this appeal, the Legislature approved (over the Governor's veto) St. 2006, c. 123, § 111, a special act that expressly "eliminated" the Nancy Sales property from the DPA, as well as from the waterways licensing requirements of G. L. c. 91. The parties have provided no supplemental arguments regarding the impact of this development on the appeal, the issues raised by which we must fully address in any event as to the remaining properties involved. With the apparent elimination of one of the two sources of funding for the design and planning of the proposed road corridor, the likelihood of that project being constructed would seem significantly more remote.

to great weight, and "we must apply all rational presumptions in favor of the validity of the administrative action" being challenged. *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 654-655 (1982), quoting from *Colella* v. *State Racing Commn.*, 360 Mass. 152, 156-157 (1971). Nonetheless, despite an appropriate judicial attitude of deference, "[o]nce an agency has seen fit to promulgate regulations, it must comply with those regulations," *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 427 (1983), and the "courts will not hesitate to overrule agency interpretations of rules when those interpretations are arbitrary, unreasonable, or inconsistent with the plain terms of the rule itself." *Manor* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 416 Mass. 820, 824 (1994), quoting from *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976).[16] An agency's "considerable leeway in interpreting a statute [or regulation] it is charged with enforcing" disappears if "a statute [or regulation] unambiguously bars the agency's approach." *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 633 (2005), quoting from *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 595-596 (1992). The "rationale for judicial deference ceases to apply where . . . the agency has failed to adhere to its own . . . regulatory framework . . . [or] [made] a decision without sufficient evidentiary support." *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. 385, 395 (1999). That is the situation before us.

---

[16]We also note that presumptive judicial deference may be tempered when the particular agency is not vested with broad discretion under its statute or regulations (as is true here), and when the interpretation being challenged is not (again, as is the case here) a long-standing or consistently applied one. Compare *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 343 (1964); *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 491-492 (1978); *Medical Malpractice Joint Underwriting Assoc. of Mass.* v. *Commissioner of Ins.*, 395 Mass. 43, 50 (1985); *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 553 (1985); *Polednak* v. *Rent Control Bd. of Cambridge*, 397 Mass. 854, 858-859 (1986); *Boston Police Superior Officers Fedn.* v. *Boston*, 414 Mass. 458, 462 (1993); *Connery* v. *Commissioner of Correction*, 414 Mass. 1009, 1010 (1993); *Morin* v. *Commissioner of Pub. Welfare*, 16 Mass. App. Ct. 20, 24 (1983).

Here, the director himself acknowledged (as did the judge) that his discretion under the DPA regulations was significantly limited. See note 19, *infra*. It also appears that OCZM had never before interpreted the DPA regulations so as to change the boundaries of, much less redesignate or exclude any constituent property from, any DPA.

The DPA designation regulations clearly state that "[a]n area of land reviewed under [the regulations] *shall be included or remain in a DPA . . .* if CZM finds that the area is in substantial conformance with the . . . criteria governing suitability to accommodate water-dependent industrial use, as appropriate to the harbor in question" (emphasis added). 301 Code Mass. Regs. § 25.04(2) (1994). It is undisputed that 465 Medford Street, the Nancy Sales property, and the CCC were found by OCZM to "meet the designation standards [set forth] at 301 CMR 24.04(2)," which "establish[ed] the suitability of the subject properties . . . to remain in the DPA."[17] Moreover, 301 Code Mass. Regs. § 25.03(5) (1994) similarly provides that:

> "Within 60 days after the close of the public comment [on the boundary review], the Director shall issue a final written designation decision stating whether the area(s) under review *shall be included* within a DPA, *in accordance with the designation standards* set forth at 301 CMR 25.04" (emphasis added).

Taken together in their plain meaning (and construing "shall" in its common obligatory rather than permissive sense, see *Johnson* v. *District Atty. for the N. Dist.*, 342 Mass. 212, 215 [1961]), these regulations mandate the inclusion of a property in the DPA when it meets the designation standards. They do not even hint that the director has any discretion to *exclude* an area that otherwise falls within designation criteria. That plain meaning is reinforced by the admonition in § 25.05(2) authorizing the OCZM to "make minor adjustments of an existing DPA boundary . . . [but] such adjustments generally should not result in a net reduction in the total area of the DPA."[18] It is further buttressed by the stated purposes of DPA regulations "to

---

[17]It is of significance that the finding of DPA suitability was made as to those properties even with respect to the criterion of adequacy of transportation, 301 Code Mass. Regs. § 25.04(2)(b)(1), which calls into question the validity of the OCZM's (and its director's) rationale for removing 465 Medford Street and the Nancy Sales property from the DPA on the ground that their cooperation was required to resolve the "fundamental problem" of lack of an adequate transportation corridor.

[18]The DPA regulations, set forth in 301 Code Mass. Regs. §§ 25.01 et seq. (1994), repeatedly use the term "shall" to signify a command, rather than a suggestion, while also employing the term "may" to indicate a permissive,

encourage water-dependent industrial use and to prohibit . . . other uses" (with exceptions not relevant to the uses the owners plan at 465 Medford Street and the Nancy Sales property), so that "what remains of the industrialized coast should be preserved to the maximum extent practicable." 301 Code Mass. Regs. § 25.01(2).

These several complementary regulatory provisions clearly circumscribe and limit the director's discretion in matters of designation.[19] See *Royce* v. *Commissioner of Correction*, 390 Mass. at 427. He nonetheless relied on language contained in the third sentence of § 25.03(5) to support his exercise of discretion in this case. That language states: "The [d]irector may qualify, limit, or otherwise condition the designation decision in any manner that serves the purposes of these regulations . . . ." The director, the judge, and the appellees have all asserted at various stages of this case that this discretion to "condition" a designation decision encompasses any condition that arguably ultimately benefits the over-all DPA,[20] including conditioning a property's exclusion from the DPA as was done here.

discretionary function. The director acknowledged that his exclusion of the two properties would result in a six percent reduction of the DPA's land area, which he deemed an acceptable cost to improve the transportation infrastructure.

[19]The director recognized that the regulations "do impose important limitations" on his discretion (which limitations, however, he regarded as only establishing "a presumption of suitability for a property to remain in or be removed from DPA," a concept that finds no basis in the language of the regulations). He acknowledged that, even under his view of his discretionary authority, (1) the designation standards establish a high presumptive threshold that any proposed discretionary action must overcome; (2) the purposes of the regulations must be advanced significantly by any exercise of discretion; and (3) any discretionary action must clearly demonstrate that it will substantially improve the ability of the DPA to serve the purposes for which it was designated. He then determined, in essentially conclusory fashion, that "the opportunity to significantly improve the transportation infrastructure of the DPA" by his conditional exclusion decision would be a "substantial benefit" to the DPA and would "clearly advance the Commonwealth's interest for which the DPA was originally established."

[20]The OCZM and the appellees rely on a "Commentary" to the designation standards, appearing at 301 Code Mass. Regs. § 25.04(3) (1994), for the proposition that property that meets the inclusion criteria can nonetheless be excluded, because OCZM "intends to apply the . . . suitability criteria in the context of groups of parcels that form coherent planning units, rather than to individual project sites . . . ." This reliance has no valid basis, since the

We do not think that the grant of limited discretion can reasonably be so broadly read. As a matter of normal syntax, the discretion to condition applies to "the designation decision" that is specified in the first sentence of § 25.03(5) — the "final written designation decision stating whether the area(s) under review *shall be included within a DPA, in accordance with the designation standards*" (emphasis added). It would be an extraordinary distortion of ordinary meaning to transform the discretion to condition a decision designating a property that must be included or remain in the DPA because it meets the designation criteria (as in the case of each property here) into discretion to do precisely the reverse, i.e., to exclude otherwise includable property, entirely and forever, from the regulatory framework intended to further the fundamental goal of protecting scarce coastal zone resources, with a result that tends to minimize, not maximize, the shrinking industrialized coast and undermines, not serves, the explicit purposes of the DPA regulations.

Nor do the usual and ordinary meanings of the operative words appearing in § 25.03(5) (meanings which we apply when construing otherwise undefined language of a regulation or statute, *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. 548, 550 [1991]) support the interpretation championed by the director and upheld by the judge below, but inconsistent with the plain terms and purposes of the DPA regulations. All three operative words ("qualify," "limit," and "condition") connote restrictions on, or a degree of modification of, an antecedent object or state[21] — here the final "designation decision stating whether . . . [a property] shall be included within a DPA, in

Commentary, read either alone or in the context of the entire DPA regulations, plainly anticipates and facilitates the *inclusion* of properties that would not meet the criteria unless considered in conjunction with other parcels. It cannot rationally be read to support the exclusion of otherwise includable properties, which would contravene not only the explicit purposes of the regulations, but also the rest of the Commentary, which expressly supports the encouragement of water-dependent industrial use as against other uses after the "consideration of all relevant factors affecting overall suitability [of the geographic area under review] to accommodate water-dependent industrial use." *Id.*

[21]See American Heritage Dictionary of the English Language 1479 (3d ed. 1992) ("qualify . . . [t]o modify, limit or restrict, as by giving exceptions"); *id.* at 1044 ("limit . . . [t]o confine or restrict within a boundary or bounds"); *id.* at 393 ("condition . . . [t]o make [something] dependent on a condition or conditions").

69 Mass. App. Ct. 243 (2007)                    253

United States Gypsum Company v. Executive Office of Environmental Affairs.

accordance with the designation standards." 301 Code Mass. Regs. § 25.03(5). They would not, in ordinary usage, appear to encompass a *complete* change or replacement, particularly one which constitutes the very opposite of the antecedent decision, i.e., exclusion from the DPA rather than inclusion, and which is incompatible with the express public purpose of preserving our diminishing coastal zone from irretrievable commitment to non-water dependent development.[22]

In short, we conclude that the judge erred in upholding what amounted to unfettered discretion on the part of the OCZM director, with respect to the conditioning of the designation of properties within the DPA so as to exclude 465 Medford Street and the Nancy Sales property from the DPA.[23] Although we must give due deference to an administrator's "expertise and experience," pursuant to G. L. c. 30A, § 14, the principle of deference does not extend to judicial abdication, *Finklestein* v. *Board of Registration in Optometry*, 370 Mass. at 478, particularly when the exercise of that expertise and experience is fundamentally at odds with overarching public policy, here that of protecting and preserving the Commonwealth's marine economy and nonrenewable coastal resources to the maximum extent practicable. As the Supreme Judicial Court recently stated in an analogous context, "[t]he rights of the public in Com-

---

[22]The discretion accorded the director in § 25.03(5), while not permitting him to ignore the mandatory suitability criteria when deciding whether a property should be included in or remain in the DPA, appears intended to allow him the flexibility to give latitude or concessions to the owner of a property otherwise includable in the DPA, such as permitting non-maritime industrial uses on a portion of the property, or temporarily delaying compliance with a designation decision for good cause.

[23]We observe that the director never cited any authority for his interpretation of the sweeping discretion he claimed under § 25.03(5) and never demonstrated, beyond conclusory assertion, that his decision overcame the "extraordinarily high presumptive threshold" of inclusion which he and the OCZM boundary review purported to acknowledge. The judge, for his part, merely concluded in summary fashion that the director acted within his "significant degree of discretion" (as defined by the director's overly broad interpretation of the regulations), but provided no meaningful analysis for that conclusion, nor any discussion of the scope of the director's asserted discretion. The recently enacted special legislation excluding the Nancy Sales property from the DPA might be seen as reflecting at least one affected property owner's skepticism regarding the legal validity of the director's position.

monwealth tidelands [and coastal resources] . . . cannot be relinquished by departmental regulation, regardless of the fact that the department has proffered potentially worthy public policy rationales in this regard." *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 353 (2007).

2. *Substantiality of the evidence*. Even were we persuaded that the director had the discretionary authority he claimed under the DPA regulations, his decision would have to be supported by substantial evidence to pass judicial muster. See *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. at 390; note 13, *supra*. We disagree with the motion judge on this point, because the record reveals that the director's conditional exclusion decision was not so supported.[24]

It was generally undisputed during the proceedings below that the inadequacy of the existing transportation infrastructure was a major problem facing the DPA (the businesses within the DPA creating significant truck traffic that congests the relatively

---

[24]Our courts, following G. L. c. 30A, § 1(6), have frequently defined substantial evidence for administrative agency review purposes as "such evidence as a reasonable mind might accept as adequate to support a conclusion after taking into consideration opposing evidence in the record," *Hotchkiss* v. *State Racing Commn.*, 45 Mass. App. Ct. 684, 696 (1998), particularly whatever in the record "fairly detracts from its weight." *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966), quoting from *Universal Camera Corp.* v. *National Labor Relations Bd.*, 340 U.S. 474, 488 (1951). "We may set aside the decision of an administrative agency if it is not supported by substantial evidence." *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. at 390. *A.W. Chesterton Co.* v. *Commissioner. of Rev.*, 45 Mass. App. Ct. 702, 710 (1998). "If the agency has, in the discretionary exercise of its expertise, made a choice between two fairly conflicting views, and its selection reflects reasonable evidence, a court may not displace [the agency's] choice." *Rodgers* v. *Conservation Commn. of Barnstable*, 67 Mass. App. Ct. 200, 204, further appellate review granted, 447 Mass. 1111 (2006), quoting from *Conservation Commn. of Falmouth* v. *Pacheco*, 49 Mass. App. Ct. 737, 739-740 n.3 (2000). However, "we are not required to affirm the [agency] merely on a finding that the record contains evidence from which a rational mind might draw the desired inference," *Cohen, supra*, and an agency's decision "must be set aside if 'the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary.' " *New Boston Garden Corp.* v. *Board of Assessors of Boston*, 383 Mass. 456, 466 (1981), quoting from *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968). *Rodgers, supra* at 205. The substantial evidence test is thus "fairly characterized as a test of rational probability." *Cobble, supra* at 390.

narrow Medford Street, which is better suited for residential use). The poor trucking facilities and annoyance to the neighboring community have been a matter of concern for decades, and as long ago as 1990, city of Boston planners studied and proposed roadway improvements in the area. It was, therefore, not illogical for OCZM and its director to conclude that a dedicated transportation corridor diverting industrial traffic off Medford Street into a two-way industrial road with a direct connection to the highway would provide substantial long-term benefits to the current and future industrial uses in the DPA. Overcoming two identified significant obstacles to construction of the roadway — paying for an engineering study and design for the transportation corridor and obtaining the right to build it over the Flatley trustees' land at 425 and 465 Medford Street — was the rationale for OCZM's and the director's exclusion decision here challenged. As the judge summarized:

> "Essentially, while concluding that 465 Medford Street and the Nancy Sales Property met the designation and standards to be included within the DPA, OCZM in its Boundary Review decided that the need for this new transportation corridor is so important to the future of the DPA that it would agree to exclude these two properties from the DPA if their owners would take specific steps [i.e., funding the design study and granting an easement] that would increase the likelihood of such a corridor being built."

The judge concluded that there was evidence to support the director's "reasonable decision . . . [and that the] conditions he extracted from the owners of 465 Medford Street and the Nancy Sales Property significantly increased the likelihood that the critical industrial roadway would be built sooner rather than later,[25] and that the remaining businesses in the DPA would economically be healthier in the long run as a result." We agree with the plaintiffs, however, that the director's decision fails the substantial evidence test.

[25]The director was actually far less qualified in his appraisal of his decision, stating: "My action will result in the completion of a designed and permitted industrial transportation corridor."

The director's designation decision failed to address the single most important issue regarding construction of a new roadway: the financing of its cost, which had been estimated to be $5 million in 1990 and, with inflation, at least $20 million in 2005. The record contains no evidence even suggesting that the Legislature, the Governor, the city of Boston, any public agency, or any private entities would be currently willing or able to pay for the roadway's construction, or would be willing or in a position to do so at any future time. Even if the owners of 465 Medford Street and the Nancy Sales property met the conditions imposed by the director as the price of their exclusion from the DPA, construction of the industrial roadway at any foreseeable time in the future remains speculative at best in the absence of any commitment of public or private funds. As even the judge noted, "[t]here certainly remains the possibility that [the director's] effort to 'jump start' the construction of this roadway will fail for lack of public funds, or that the effort will not bear fruit for many years."[26]

In sum, there was no evidence — let alone substantial evidence — that the industrial roadway deemed important enough by the director to take the drastic step of excluding otherwise suitable properties from the DPA will ever be constructed, for want of financing, in the reasonably near, or even in the remote, future. The director's decision thus failed the test of "rational probability."[27] He was not presented with a choice between two fairly conflicting views. On this record, there were not conflicting views about the clearly stated purposes of the DPA regulations to preserve water-dependent industrial uses and prohibit other uses within the DPA to the maximum extent practicable;

[26]Furthermore, rather than benefiting the DPA, as was his intention, the director's decision promised actually to harm it. The judge recognized that "until the new roadway is built, the concessions [the director] made will make the traffic situation worse, because the new artists' lofts and residences at the Nancy Sales Property will add to automobile and pedestrian traffic, leave even less room for the trucks to pass, and create even greater conflicts between the neighborhood and the DPA businesses."

[27]The judge's description of the director's action, as being one "permanently reduc[ing] the size of the DPA in return for commitments that he hoped would 'leverage the development' of a direct truck route that has not been funded and may never be built," perhaps unwittingly revealed the precatory, if not impractically conjectural, nature of the decision.

nor about the subject properties meeting all of the DPA criteria (they did); nor about the director's decision having the conceded effect of exacerbating the traffic situation; nor about the absence of any reasonably foreseeable source of financing for the industrial roadway.

The judge's characterization of the decision's making the roadway a reality "sooner rather than later," with benefit to the DPA "in the long run," was impermissibly and reversibly vague and speculative, because the evidence supporting those imprecise predictions pointed to no "appreciable probability" that the roadway would ever be built.[28] The judge accordingly erred in failing to reverse the director's designation decision to the extent it excluded 465 Medford Street and the Nancy Sales property from the DPA.

3. *The Charlestown Commerce Center.* Our ruling as to those two properties affirmatively resolves the first of CCC owner Pizzuti's alternative demands, for reversal of the decision excluding those properties from the DPA. As to his primary prayer — the reversal of that part of the designation decision which continued the inclusion of the CCC in the DPA, the judge correctly held that there was "more than substantial evidence" in the adminis-

[28]See *Boston Gas Co.* v. *Department of Telecommunications & Energy,* 436 Mass. 233, 239 (2002), quoting from *Blue Cross & Blue Shield of Mass., Inc.* v. *Commissioner of Ins.,* 420 Mass. 707, 714 (1995) ("[T]he department may not 'speculate as to the existence of some future fact without any proper basis or explanation"). As John Maynard Keynes perceptively noted in A Tract on Monetary Reform (1923), "*Long run* is a misleading guide to current affairs. *In the long run* we are all dead." For representative examples of cases reversing agency decisions that relied on speculative, or lacked the support of substantial, evidence, see *Cohen* v. *Board of Registration in Pharmacy,* 350 Mass. at 251-253; *New England Tel. & Tel. Co.* v. *Dept. of Pub. Util.,* 371 Mass. 67, 73-74 (1976); *New Boston Garden Corp.* v. *Board of Assessors of Boston,* 383 Mass. 456, 467-475 (1981); *Cobble* v. *Commissioner of the Dept. of Soc. Servs.,* 430 Mass. at 391-395; *Levy* v. *Acting Governor,* 436 Mass. 736, 749-752 (2002); *Attorney General* v. *Commissioner of Ins.,* 442 Mass. 793, 796, 808 (2004); *Griffin's Brant Rock Package Store, Inc.* v. *Alcoholic Bevs. Control Commn.,* 12 Mass. App. Ct. 768, 770-773 (1981); *A.W. Chesterton Co.* v. *Commissioner of Rev.,* 45 Mass. App. Ct. 702, 710-714 (1998); *Ludvigsen* v. *Dedham,* 48 Mass. App. Ct. 682, 685-686 (2000); *National Sch. Bus Serv., Inc.* v. *Commissioner of the Dept. of Employment & Training,* 49 Mass. App. Ct. 445, 450-452 (2000); *Horvitz* v. *Commissioner of Rev.,* 51 Mass. App. Ct. 386, 395-396 (2001); *North Attleboro* v. *Labor Relations Commn.,* 56 Mass. App. Ct. 635, 638-640 (2002).

trative record establishing that the CCC met the four regulatory criteria for inclusion within the DPA, as specified in 301 Code Mass. Regs. § 25.04(2) and (3) (1994). Pizzuti's contention that his due process rights were violated by the OCZM's failure to include him in the "negotiations" that led to the exclusion of 465 Medford Street and the Nancy Sales property was correctly rejected by the judge as being without factual or legal basis (the agency having fully complied with its notice and comment obligations under its regulations), and is, in any event, effectively rendered moot by our reversal of that exclusion decision.

Finally, we agree with the judge's holding that the continued inclusion of the CCC within the DPA does not constitute an unconstitutional regulatory taking that must be annulled.[29] Pizzuti's claim to have been deprived of all "economically viable use" of his land by virtue of its inclusion is without merit, because he failed to support his motion for judgment on the pleadings[30] with *any* facts (in the form required by Mass. R.Civ.P. 56(e), 365 Mass. 824 [1974]), and rested only on the allegations of his unverified complaint and the conclusory assertions in his memorandum supporting his motion.

Moreover, as OCZM and the judge observed, the facts in the administrative record demonstrate that Pizzuti could not prove a takings claim as to the CCC (even were he entitled to "independent" de novo judicial review), because the DPA regulations permit twenty-five percent of the property (and, under certain conditions, up to thirty-five percent) to be used for nonwater dependent and nonindustrial purposes (so long as they are not incompatible with activities characteristic of a working waterfront).[31] See 310 Code Mass. Regs. § 9.02 (1994).

On this record (even viewed in the light most favorable to

---

[29]The judge accurately noted that Pizzuti was not presently seeking compensation for the supposed taking (which would require a separate proceeding under G. L. c. 79, § 10) but rather hoped to obtain a de novo evidentiary hearing regarding the inclusion of the CCC within the DPA, at which the court would not be limited to the administrative record and need give no deference to the OCZM fact finding. The judge saw this as an attempt "to make an end run around the strictures of an administrative appeal by raising a constitutional claim." We agree.

[30]See note 12, *supra.*

[31]In fact, the record reveals that the CCC is currently renting out two-thirds of its building space for nonwater dependent uses, pursuant to a pending

him), Pizzuti could not establish that inclusion of the CCC in the DPA constituted a categorical taking by depriving him of all economically beneficial use. See *Zanghi* v. *Board of Appeals of Bedford*, 61 Mass. App. Ct. 82, 83-87 (2004), and cases cited. Compare *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1019 n.8 (1992) (acknowledging that loss of even ninety-five percent of use of property in consequence of regulatory restrictions is not deprivation of "all" use for taking purposes).[32]

Pizzuti argues that he has a valid taking case even if there were not a complete denial of all beneficial use on his property (under the multifactor inquiry of *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 123-134 [1978], used to determine if a regulation has gone "too far" and become an unconstitutional taking). That claim was also correctly rejected by the judge. In the *Penn Cent. Transp.* case, the United States Supreme Court identified three principal factors to guide the inquiry: the economic impact of the regulation; the extent to which it has interfered with the owner's "distinct investment-backed expectations"; and the character of the government actions.[33] *Id.* at 124. Pizzuti's claim finds no sustenance under any of the factors.

---

"amenity license" application with the Department of Environmental Protection.

[32] The judge also noted that Pizzuti's taking claim was probably not ripe for review in any event as long as he continued to lease his building space through the "amenity license" application process. See note 31, *supra*. We think the judge's conclusion correct on the facts of record (even if the application for the amenity license had not yet been acted on), because a "regulatory takings case becomes ripe for adjudication only after two requirements are satisfied. First, an owner must allow the responsible government entity to reach 'a final decision regarding the application of the regulation to the property at issue' [which the Director's designation decision represented] . . . . Second, an owner must exhaust available State remedies before seeking relief under Federal Law." *Giovanella* v. *Conservation Commn. of Ashland*, 447 Mass. 720, 723 (2006), cert. denied, 127 S. Ct. 1826 (2007), quoting from *Williamson County Regional Planning Commn.* v. *Hamilton Bank*, 473 U.S. 172, 186 (1985). As long as the amenity license application was being processed and had not been denied, the second ripeness requirement was unsatisfied here.

[33] A fourth factor frequently applied in this analysis, the validity of the regulation involved, see *FIC Homes of Blackstone, Inc.* v. *Conservation Commn. of Blackstone*, 41 Mass. App. Ct. 681, 688 (1996), requires little discussion, since Pizzuti has not argued, much less established, that the DPA regulations are invalid or do not "substantially advance legitimate State interests." *Id.* at 690, quoting from *Lopes* v. *Peabody*, 417 Mass. 299, 307 n. 13 (1994).

The economic impact here (as discussed above), even if causing a substantial diminution in the fair market value of the CCC, is not sufficiently serious or severe to create a right of compensation. See *W.R. Grace & Co.-Conn.* v. *City Council of Cambridge*, 56 Mass. App. Ct. 559, 575 (2002); *Zanghi* v. *Board of Appeals of Bedford*, 61 Mass. App. Ct. at 89; *Concrete Pipe & Prods. of Cal.* v. *Construction Laborers Pension Trust*, 508 U.S. 602, 645 (1993). Pizzuti could not have had a reasonable investment-backed expectation that his property would be free of DPA restrictions when it was already included as part of the DPA at the time he purchased it in 1992. See *Leonard* v. *Brimfield*, 423 Mass. 152, 155, cert. denied, 519 U.S. 1028 (1996); *Lucas* v. *South Carolina Coastal Council*, 505 U.S. at 1030. Contrast *Palazzolo* v. *Rhode Island*, 533 U.S. 606, 626-628, 631 (2001). Finally, since there was no "physical invasion" of Pizzuti's property, the character of the governmental action here involved was not indicative of a taking. See *FIC Homes of Blackstone, Inc.* v. *Conservation Commn. of Blackstone*, 41 Mass. App. Ct. 681, 695 (1996); *W.R. Grace & Co.-Conn.* v. *City Council of Cambridge, supra* at 575. Summary judgment was, consequently, properly granted to the defendants on Pizzuti's taking claims.

*Disposition.* For the foregoing reasons, we reverse the judgment of the Superior Court, dated March 24, 2005, to the extent it denies the motions of Gypsum, LaFarge, Pizzuti, and the Conservation Law Foundation for judgment on the pleadings or summary judgment seeking reversal of the decision excluding 465 Medford Street and the Nancy Sales property from the DPA. In all other respects, that judgment is affirmed.

*So ordered.*