612                84 Mass. App. Ct. 612 (2013)

Beverly Port Marina, Inc. *v.* Commissioner of the Department of Environmental Protection.

BEVERLY PORT MARINA, INC. *vs.* COMMISSIONER OF THE
DEPARTMENT OF ENVIRONMENTAL PROTECTION & another.[1]

No. 12-P-2010.

Essex. September 12, 2013. - December 11, 2013.

Present: GREEN, GRAINGER, & FECTEAU, JJ.

*Department of Environmental Protection. Administrative Law,* Agency's
interpretation of regulation, Regulations. *Regulation. Real Property,* Lit-
toral property, License. *License.*

Discussion of the statutory and regulatory framework governing development
in designated port areas. [619-620]
Discussion of the standard of review applied by this court when reviewing an
agency's decision. [620-621]
In proceedings concerning a license application under G. L. c. 91 for a project
proposed in a "designated port area" on filled tidelands, the conclusion of
the commissioner of the Department of Environmental Protection that a
competing proposal submitted during the public comment period on the
license application did not meet the criteria specified in 310 Code Mass.
Regs. § 9.36(5)(a) was legally erroneous and not supported by substantial
evidence. [621-624]

CIVIL ACTIONS commenced in the Superior Court Department
on July 22 and November 7, 2011.

After consolidation, the case was heard by *David A. Lowy*, J.,
on motions for judgment on the pleadings.

*Adam J. Brodsky* for the plaintiff.

*Louis M. Dundin*, Assistant Attorney General, for Department
of Environmental Protection.

*Richard A. Nylen, Jr.*, for city of Beverly.

GREEN, J. Under the regulations governing issuance of li-
censes under G. L. c. 91 for projects on filled tidelands, a license
may not issue for a project proposed in a "designated port
area" (DPA) if a proposal for a "competing project" submitted

_____
[1]City of Beverly.

during the public comment period on the license application would promote water-dependent industrial uses of the project site to a greater extent than the project proposed in the license application. See 310 Code Mass. Regs. § 9.36(5)(a) (1994). During review by the Department of Environmental Protection (DEP) of an application by the city of Beverly (city) for licenses authorizing, inter alia, construction and operation of a restaurant on a waterfront site, the plaintiff, Beverly Port Marina, Inc. (BPM), submitted a proposal to, inter alia, build and operate a boatyard on the site instead. A DEP hearing officer (presiding officer) concluded that BPM's submission failed to demonstrate that its proposal was feasible, and recommended issuance of the licenses, with conditions, for the city's proposed project. The DEP commissioner adopted the recommended decision, and BPM appealed the decision to the Superior Court, where a judge affirmed the decision on cross motions for judgment on the pleadings. We conclude that BPM's competing proposal adequately satisfied the criteria established by the applicable regulations, and we vacate the judgment.

*Background.* The site at the center of the controversy among the parties is a parcel owned by the city known as "Glover's Wharf," located along the Beverly waterfront. The site is at the westernmost end of a DPA established in 1978 under the Massachusetts Coastal Zone Management Plan. See 301 Code Mass. Regs. § 20.03 (1979); 310 Code Mass. Regs. § 9.24(2) (1979). The city also owns an adjacent parcel, Ferry Way Landing, farther west of the site, outside the DPA. BPM owns a parcel to the east of the site, within the DPA, on which it operates a marina and boatyard.

From the 1970s until 1995, Glover's Wharf was occupied by a McDonald's restaurant.[2] After the restaurant closed, the city purchased the site, with partial funding assistance from the urban self-help program administered by the division of conservation services (DCS) within the Executive Office of Environmental Affairs, pursuant to St. 1977, c. 933, as amended

---

[2]The restaurant was already in operation on Glover's Wharf at the time the DPA was established.

through St. 1984, c. 233, § 3.[3,4] In order to obtain funding for its purchase of the site, the city entered into an agreement with DCS (project agreement), which described the city's plan to lease the former McDonald's building for use as a restaurant, to maintain and rent to the public a number of boat slips in the adjacent harbor, and to provide public parking for visitors to the waterfront.[5] The project agreement provided that the Commonwealth would reimburse the city $483,600 for acquisition of the land. Paragraph 4 of the agreement provides:

> "The [city] acknowledges Article 97 of the Massachusetts Constitution which states, in part, that: 'Lands . . . acquired for such [park, recreation or conservation] purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two-thirds vote . . . of the General Court.' The [city] hereby agrees that any property or facilities comprising the project will not be used for purposes other than those stipulated herein or otherwise disposed of unless the [city] receives the appropriate authorization from the General Court, the approval of the secretary of Environmental Affairs, and any authorization required by the provisions of M.G.L. c. 40, s. 15A."

Since its purchase of the site in 1996, the city has used the site for parking, for public access to the waterfront, and as a park. The former McDonald's building was used briefly as a homeless shelter. The city also operated a recreational marina until 2005, when its c. 91 license for that use expired.

In 2006, the city issued a request for proposal, soliciting

---

[3]In 2007, the Executive Office of Environmental Affairs was renamed the Executive Office of Energy and Environmental Affairs (EOEEA). See St. 2007, c. 19, § 12.

[4]The urban self-help program authorized the reimbursement of cities and towns for funds expended for the acquisition of lands for municipal park and recreation purposes.

[5]The project agreement made no attempt to reconcile the proposed uses of the site with the requirement arising under c. 91, due to its location within a DPA, that the site be dedicated to water-dependent industrial uses. Indeed, the city checked "no" on its application for urban self-help grant funds in response to the question whether permits were required from the DEP's division of wetlands and waterways, and "no" in response to the question whether the site required any permits from the Coastal Zone Management Office by virtue of the Commonwealth's tidelands regulations.

proposals for a long-term lease of the site for operation of a commercial restaurant, together with conservation and/or recreational uses. A restaurant chain, the Black Cow, submitted a proposal that included a forty-year ground lease, at an annual rental of $50,000, and replacement of the existing vacant building with a two-story, 7,000-square-foot building to house a 362-seat restaurant.[6] The Black Cow proposal also expressed a need for sixty-seven on-site parking spaces to serve the proposed restaurant, and twenty-eight parking spaces to serve the marina slips. The Black Cow proposal suggested rescission of the DPA applicable to the project site.

In October, 2008, the city submitted a c. 91 license application to DEP to pursue the Black Cow proposal. Rather than seeking rescission of the DPA, however, the city's application proposed water-dependent industrial uses (including commercial passenger vessel operations) to occupy the first floor of the proposed new building. The city submitted a separate application for a license to convert two bottom-anchored base floats to permanent pile-supported floats, along with a ramp for access to the floats.

BPM submitted comments objecting to both of the city's proposals. As to the Black Cow project, BPM asserted that it was inconsistent with c. 91 regulatory requirements for projects within a DPA. On December 23, 2008, BPM also timely submitted a proposal for a "competing project," pursuant to 310 Code Mass. Regs. § 9.36(5)(a) (1994).[7] In its proposal, BPM proposed to lease the site for forty years at an annual rental of

---

[6]The restaurant later reduced the number of seats proposed to 200.

[7]Title 310 Code Mass. Regs. § 9.36(5) is as follows:

> "The project shall not include fill or structures for nonwater-dependent or water-dependent, non-industrial uses which preempt water-dependent industrial use within a Designated Port Area (DPA). In applying this standard the [DEP] shall act in accordance with the following provisions:
>
> > "(a) such fill or structures shall not occupy tidelands which the [DEP] determines are necessary to accommodate a competing party who intends to develop such tidelands for water-dependent industrial use, provided written notice of such party's intention is submitted to the [DEP] prior to the close of the public comment period on the license application; such determination shall be based upon a clear showing, within a period of time deemed reason-

$60,000, and to use the site as a boatyard and to perform boat repairs, with recreational uses in the former McDonald's building, and use of the adjacent pier for commercial fishing and a research vessel, as well as recreational boats. BPM included with its submission a feasibility study prepared by Quantum Associates. The feasibility study generally concluded that BPM had the financial capacity and expertise to carry out its proposed use of the site, and that the market for the services BPM proposed to offer was adequate to support the proposal. However, the last paragraph of the feasibility study was inconclusive on the question whether the proposed project would comply with the requirements imposed by the project agreement (presumably, the art. 97 restrictions).[8] Subsequently, by letter dated March 25, 2009, Melissa Cryan, the EOEEA grant manager, informed BPM that its proposal to use the ground floor of the former McDonald's building for recreational purposes, such as charter fishing and boat rentals, would conform to the requirements of the project agreement, and that its plan to provide a minimum of six parking spaces year-round for outdoor recreation purposes would also conform to the project agreement.[9]

---

able by the [DEP], that the competing project would promote water-dependent industrial use of the DPA to a greater degree than the proposed project, and that the competing party:

"1. is a state or local governmental agency, or is a maritime business or other organization with the expertise, experience, and financial ability to implement the competing project;

"2. has prepared detailed development plans for the competing project, including appropriate feasibility studies;

"3. has tendered an offer to purchase title or other rights to the tidelands in question, at fair market value for water-dependent industrial use; and

"4. has proposed waterways license conditions or other arrangements which will restrict the tidelands in question to the uses contained in the competing projects for a period of time deemed appropriate by the [DEP]."

[8]The feasibility study observed that BPM had consulted with Melissa Cryan, the EOEEA grant manager, and that BPM had requested a letter confirming that the project would comply with the project agreement requirements, but that BPM had not yet received such a letter.

[9]Cryan's letter observed that she could not "say specifically" whether

On March 1, 2010, DEP waterways permitting staff issued their first "Written Determination," disqualifying BPM's proposal because it had not complied with the provisions of G. L. c. 30B. The determination also indicated DEP's intent to issue the requested licenses to the city. The city then moved to dismiss BPM's proposal from consideration. In response, DEP's senior counsel, upon further consideration, concluded that compliance with c. 30B was not a prerequisite to consideration of competing proposals under 310 Code Mass. Regs. § 9.36(5)(a),[10] and requested that the presiding officer remand the matter in order for DEP waterways permitting staff to evaluate BPM's proposal further. The matter was accordingly remanded, and in a September 3, 2010, "Revised Written Determination," DEP's waterways staff found that BPM's proposal met all of the criteria of § 9.36(5)(a) and that it "promotes water-dependent industrial use to a greater extent than the proposed project." The waterways staff concluded, therefore, that the city's project was not eligible for licensing. In this posture, the matter went to hearing.

Following the hearing, and after receipt of the parties' closing briefs, the presiding officer, in an electronic mail message to DEP staff, requested staff to reconcile the requirements of the project agreement, that the site be dedicated to recreational uses, with the waterways regulations, requiring that land within DPAs be dedicated to water-dependent industrial uses. DEP senior counsel responded that the waterways regulations did not require DEP to consider compliance with other laws, unless specifically mentioned in the regulations, and that the urban self-help grant did not appear in the waterways regulations. Counsel therefore concluded that DEP "should [neither] take any further action [n]or perform any further analysis with regard to the Urban Self-Help Grant," and that "[s]uch analysis or testimony does not pertain to any of the identified issues in this case and is legally irrelevant to any regulations . . . which are applicable to this project." He further observed that, in any event, "[o]n information and belief, DCS staff has verbally communicated to DEP that both [the city's and BPM's] projects

BPM's competing proposal was satisfactory in its entirety, as she "was not given a hard copy of the entire proposal."

[10]The issue is not before us in this appeal.

appeared feasible from [DCS's] standpoint." Lastly, counsel commented, "If this issue were legally relevant, fairness would require the reopening of the hearing with opportunity for testimony and argument by all parties. It does not relate to any of the stated issues [in the prehearing scheduling order]."[11]

Thereafter, the DEP presiding officer prepared a detailed written "recommended final decision," expressing her conclusion that BPM had failed to demonstrate that its competing proposal was feasible, and that its failure in that regard removed the proposal as a bar, under 310 Code Mass. Regs. § 9.36(5) (1994), to issuance of a c. 91 license to the city for the Black Cow project. The presiding officer based her conclusion principally upon BPM's failure to establish that its proposal would comply with the requirements imposed by the project agreement "[d]ue to the nature of the restrictions on Article 97 lands." Because BPM's proposal did not comply with the project agreement, the presiding officer reasoned, it could not be carried out and, therefore, was not feasible. Having concluded that BPM's competing proposal stood as no obstacle to issuance of a license, the presiding officer concluded that the city's proposal met the requirements for issuance of a c. 91 license, and recommended issuance of the requested licenses, with conditions.[12] The presiding officer's recommendation was adopted by the DEP commissioner.

After issuance of the DEP commissioner's final decision, BPM moved for reconsideration, arguing that the question of feasibility had not been framed for resolution in the hearing conducted by the presiding officer, see note 11, *supra*, and that the hearing should be reopened to allow presentation of additional evidence to demonstrate that the BPM proposal could satisfactorily comply with the requirements of the project agreement.

---

[11]The amended scheduling order framed the following issue for adjudication regarding the city's two license applications: "Whether the [DEP's] license . . . meets the requirements of 310 CMR 9.36(5), as to the preemption of water-dependent-industrial uses within a DPA? (this issue is intended to address BPM's competing proposal)."

[12]Our view of the case makes it unnecessary for us to evaluate the correctness of the presiding officer's decision on the merits of the city's license applications.

DEP senior counsel concurred with BPM's request, opining that "[t]he legal basis of the [presiding officer's] Recommended Final Decision . . . was an erroneous legal standard for project feasibility pursuant to 310 CMR 9.36(5)(a)(2) that was not argued by any Party or by the Presiding Officer during the adjudicatory hearing. . . . The . . . Decision was also erroneously based in part on an EOEEA Policy relating to Article 97. . . . [B]oth [DEP] and the Superior Court have held that Article 97 is outside the [DEP]'s express statutory authority." Notwithstanding counsel's comments, the presiding officer recommended denial of reconsideration, and the DEP commissioner adopted that recommendation, issuing a "Final Decision on Reconsideration."

BPM appealed the final decision on reconsideration to the Superior Court, and a judge of that court affirmed the commissioner's decision. This appeal followed.

*Discussion.* a. *Statutory and regulatory framework.* "General Laws c. 91 governs, among other things, water- and nonwater-dependent development in tidelands and the public's right to use those lands. Chapter 91 finds its history in the public trust doctrine, 'an age-old concept with ancient roots . . . expressed as the government's obligation to protect the public's interest in . . . the Commonwealth's waterways.' " *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 342 (2007), quoting from *Trio Algarvio, Inc.* v. *Commissioner of the Dept. of Envtl. Protection*, 440 Mass. 94, 97 (2003). Within tidelands regulations generally, certain "primary working waterfronts" are subject to further regulation as DPAs. *Boston Edison Co.* v. *Massachusetts Water Resources Authy.*, 459 Mass. 724, 736 (2011). Under the DPA regulations, "a nonwater-dependent use project on tidelands within a DPA shall be eligible for a license only if it accommodates one of the following uses on a limited basis: a use to be licensed in combination with water-dependent industrial uses within a marine industrial park, a temporary use, or 'a supporting DPA use, as defined in 310 Code Mass. Regs. § 9.02.' " *Id.* at 737, quoting from 310 Code Mass. Regs. § 9.32(1)(b)(4) (2008).[13] "[I]n reviewing license applications for nonwater-dependent uses in DPAs, the DEP first determines whether there

---

[13]"Supporting DPA Use means an industrial or commercial use in a [DPA]

is a bona fide industrial use that has expressed an interest in using the site. If there is, the DEP will yield to that marine industrial use, but if there is not a competing interest, it then can consider other nonmarine industrial uses for . . . that property." *Id.* at 738 (quotation omitted). The evaluation of such competing interests occurs under the rubric of 310 Code Mass. Regs. § 9.36(5)(a), to which we referred earlier. See note 7, *supra.*

b. *Standard of review.* As a general matter, we are obliged to "uphold an agency's decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Massachusetts Inst. of Technology* v. *Department of Pub. Utils.,* 425 Mass. 856, 867-868 (1997). " 'Substantial evidence,' as defined by statute, is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.' G. L. c. 30A, § 1(6). In conducting this review, we must 'give due weight to the experience, technical competence and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it,' G. L. c. 30A, § 14(7), and should defer to the agency on questions of fact and reasonable inferences drawn from the record." *Cobble* v. *Commissioner of the Dept. of Social Servs.,* 430 Mass. 385, 390 (1999).

In reviewing an agency's interpretation of applicable regulations, "[w]e interpret a regulation in the same manner as a statute, and according to traditional rules of construction. Thus, we accord the words of a regulation their usual and ordinary meaning. We ordinarily accord an agency's interpretation of its own regulation considerable deference. However, this principle is deference, not abdication, and courts will not hesitate to overrule agency interpretations when those interpretations are arbitrary, unreasonable, or inconsistent with the plain terms of the regulation itself." *Warcewicz* v. *Department of Envtl. Protection,* 410 Mass. 548, 550 (1991) (citations omitted). Moreover,

that provides water-dependent industrial use in the DPA with direct economic or operational support, to an extent that adequately compensates for the reduced amount of tidelands on the project site that will be available for water-dependent industrial use during the term of the license." 310 Code Mass. Regs. § 9.02 (1994).

our judicial deference "may be tempered" when (as in the present case) the agency interpretation at issue is not one of long-standing or consistent application.[14] *United States Gypsum Co.* v. *Executive Office of Envtl. Affairs*, 69 Mass. App. Ct. 243, 249 n.16 (2007).

c. *Competing project.* Whether viewed from the perspective of legal error or substantial evidence, the conclusion that BPM's competing proposal did not satisfy the requirements of 310 Code Mass. Regs. § 9.36(5)(a) cannot stand.

As a threshold matter, we observe that the regulation does not, by its express terms, require that the proponent of a competing proposal demonstrate that the proposal is feasible; the lone reference to feasibility appears in subsection 2, which requires a clear showing that the competing party "has prepared detailed development plans for the competing project, including appropriate feasibility studies." See note 7, *supra.* To be sure, as the presiding officer observed, it is implicit in the requirement to submit a feasibility study that the study illustrate, at least to some extent, that the proposal is feasible, rather than that it is not. However, that does not mean that the competing party must establish conclusively that the project will be able to obtain all necessary permits or other third-party approvals. In this regard, we view as particularly unpersuasive the presiding officer's conclusion that BPM's proposal is not feasible for the independent reason that the city is unwilling to lease the site to it. Inherent in the nature of a competing proposal is the dynamic of the present case, in which the competing party appears late in the approval process, as an obstacle to a license application submitted by the owner of a site who seeks to pursue a different project; by the

---

[14]The parties do not dispute the observation made by the presiding officer that the present case presents the first occasion in which the DEP has been asked to evaluate a "competing project" under 310 Code Mass. Regs. § 9.36(5)(a), or to interpret the meaning of the regulation as applied to a particular project.

Moreover, the hearing officer specifically limited the force of her interpretation of the regulation, commenting that she intended that it should be limited to the facts of this case. She speculated, for example, that in a future case, if a zoning by-law conflicted with a competing proposal that would make greater use of a site for water-dependent industrial use, it might be appropriate to expect a municipality to modify the by-law, rather than consider the by-law an insurmountable obstacle.

very nature of the process, the competing party typically will not own or otherwise control the site, and will be viewed with some antipathy by the license applicant. The purpose of the regulation precluding issuance of a license if a competing proposal materializes from a party ready, willing, and able to use the site for water-dependent industrial uses to a greater extent than proposed by the license applicant, is not to ensure that the competing proposal actually goes forward but, instead, to ensure that the applicant's less satisfactory project (from the perspective of the regulatory purpose of fostering water-dependent industrial uses) will not preempt availability of the tidelands site for alternative uses more in keeping with that objective.

We also note that the DEP's review of a c. 91 license application typically ought not inquire into the applicant's acquisition of other permits necessary for the project. See *Mahajan* v. *Department of Envtl. Protection*, 464 Mass. 604, 622 (2013) ("For lands to which art. 97 . . . appl[ies], art. 97 legislative approval is likely just one of the many approvals a project proponent will need to acquire in order to proceed with the project. These approvals are issued by various State and local regulatory agencies and are largely independent of one another, yet all are necessary to proceed with the project. It would make little practical sense to condition the application for one such approval, in this case the chapter 91 license, on the successful application for another approval. The chapter 91 license facilitates the change in use in the same way the zoning variances and other necessary approvals do. A project proponent . . . could conceivably obtain the necessary approvals to change the use of land and, for myriad reasons, never follow through on the planned use. Article 97 requires a two-thirds vote of the Legislature prior to an actual change in use, not mere preparations for that change").

Nor does issuance of a c. 91 license constitute a "disposition" for purposes of art. 97. See *id.* at 621-622. Put simply, the DEP is without either jurisdiction or expertise to perform an assessment of such externalities. We acknowledge that it is perhaps reasonable, in evaluating a competing proposal submitted pursuant to 310 Code Mass. Regs. § 9.36(5)(a), to conduct

some inquiry into whether intractable impediments would prevent prosecution of the alternative proposal, so that an objecting party may not submit a purely fanciful competing proposal simply to prevent approval of an otherwise suitable project on tidelands. However, we reject the suggestion that the DEP should issue a c. 91 license without regard to the applicant's ability to obtain other permits or comply with other restrictions, while requiring a competing party to establish conclusively that it can obtain all such permits or satisfy all such restrictions, before treating the competing proposal as satisfying the criteria of § 9.36(5)(a).

Finally, the record in the present case does not support a conclusion that BPM's competing proposal is not feasible. Preliminary discussions with the urban self-help grant manager indicated that BPM's proposal could be accommodated within the framework of the project agreement, and nothing in the record suggests any unwillingness on the part of DCS or the grant administrators to modify the project agreement, if necessary, to facilitate BPM's alternative proposal.[15] At most, the record was simply inconclusive on the question. We also note that the question whether the BPM proposal complied with the project agreement was not clearly framed as an issue for adjudication in the amended scheduling order for the hearing,[16] and the presiding officer denied the request by BPM (in which DEP staff had

---

[15]We observe that the DPA designation for the site predates the art. 97 restrictions contained in the project agreement by some seventeen years. While it is conceivable that compliance with both designations could be impossible for a given project, that does not appear to be the case here, as we have noted. In any event, given the observation in *Mahajan* v. *Department of Envtl. Protection*, 464 Mass. at 622, concerning art. 97 lands, the DEP hearing process was not the proper occasion for a determination whether the requirements of the two provisions — art. 97 and the DPA designation — were irreconcilable and, if so, which should take precedence.

We assume (though we need not decide) that a property owner may not record a restrictive covenant or enter into a contract or lease with a third party, under terms that purport to limit the ability to use a site for water-dependent industrial uses, simply for the purpose of avoiding the potential that a competing proposal could prevent issuance of a c. 91 license for nonwater-dependent uses.

[16]As to the provisions of the amended scheduling order, see note 11, *supra.* We note, moreover, that, while the revised written determination of the DEP waterways staff was not binding on the presiding officer, neither did it signal any question regarding the feasibility of the competing proposal.

joined) to reopen the hearing to allow presentation of additional evidence on the question, following issuance of her recommended final decision.

*Conclusion.* For the reasons explained above, the DEP's conclusion that BPM's competing proposal did not meet the criteria specified in 310 Code Mass. Regs. § 9.36(5)(a) (1994) was legally erroneous and was not supported by substantial evidence. Accordingly, the judgment of the Superior Court is vacated, and a new judgment shall enter, vacating the decision of the DEP and remanding the matter to the agency for issuance of a decision denying the city's license applications.

*So ordered.*