SUPERIOR COURT 
 
 266 BORDER LLC v. OFFICE OF COASTAL ZONE MANAGEMENT WITHIN THE EXECUTIVE OFFICE OF ENERGY AND ENVIRONMENTALAFFAIRS[1]

 
 Docket:
 2384CV00149-C / 2384CV00168-C / 2384CV00177-C / 2384CV00194-C
 
 
 Dates:
 April 10, 2024
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON PARTIES' CROSS'..MOTIONS FOR JUDGMENT ON THE PLEADINGS AND PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT
 
 

             Plaintiffs in these consolidated actions seek a declaratory judgment that Defendant, the Office of Coastal Zone Management ("Defendant" or the "OCZM"), lacks the legal authority to set or modify boundary lines for designated port areas ("DPAs") pursuant to 301 Code Mass. Regs.§ 25.00. In the alternative, Plaintiffs claim that they are entitled to relief under G.L. c. 30A, § 14 or G.L. c. 249, § 4, because the OCZM's decision to include their properties in the East Boston DPA was arbitrary and capricious, based on errors of law, and unsupported by substantial evidence. Plaintiffs have moved for judgment on the pleadings on all claims of administrative challenge, and partial summary judgement on their claims for declaratory relief. Defendant has cross-moved for judgment on the pleadings per Superior Court Standing Order 1-96, para. 4.
            For the reasons which follow, Plaintiffs' motions for judgment on the pleadings and partial summary judgment are DENIED, the Defendant's cross-motions are ALLOWED., and
 
--------------------------------------------
 
[1] Consolidated with EBCBC, Inc. v. Office of Coastal Zone Management, No. 2384CV00168-C; Sixty Border Street, LLC and 170 Border Street, LLC v Office of Coastal Zone Management, No. 2384CV00l77-C; and Sixty Border Street, LLC v. Office of Coastal Z6ne Management, No. 2384CV00194-C.
 
                                                            -1-
 
SUMMARY JUDGMENT shall enter for the Defendant on Plaintiff's claims for declaratory judgment.[2]
STATUTORY AND REGULATORY BACKGROUND
            "For centuries, the Commonwealth has recognized the importance of regulating its tidelands under the public trust doctrine, an age-old concept with ancient roots expressed as the government's obligation to protect the public's interest in the Commonwealth's waterways." Armstrong v. Secretary of Energy & Env't Affs., 490 Mass. 243,248 (2022) (internal quotation omitted). See also Boston Waterfront Dev. Corp. v. Commonwealth, 378 Mass. 629, 631-37 (1979) (recounting common-law history of public trust doctrine from ancient Rome to the Commonwealth's modem waterway laws). Under this doctrine, "the government holds tidelands in trust for the benefit of the public for traditional, water-dependent uses such as fishing, fowling, and navigation, as well as for nontraditional, nonwater-dependent uses that serve a proper public purpose." Armstrong, 490 Mass. I 244.
            The "modem embodiment of the public trust doctrine" is G.L. c. 91, the Waterways Act. See Navy Yard Four Assocs., LLC v. Department of Env't Prot., 88 Mass. App. Ct. 213,221 (2015). First enacted in 1866, the statute "governs ... water- and nonwater-dependent development in tidelands and the public's right to use those lands." Id., quoting Moot v. Department of Env’t. Prot., 448 M ss. 340,342 (2007). Accord Armstrong. 490 Mass. at 249 n.11. Chapter 91 designates MassDEP[3] as the agency responsible for administering the licensing
 
--------------------------------------------
 
[2] Although Defendant has not cross-mov d for summary judgment, other than by speaking motion at hearing, the Court has authority at its own initiative (absent unfair surprise) to enter summary judgment against Plaintiffs on claims and issues raised in their motions. See Langston v. Commissioner of Corr., 34 Mass. App. Ct. 564, 576 (1993).
[3] Formerly, the Department of Environmental Quality Engineering (hereinafter referred to collectively as "MassDEP").
 
                                                            -2-
 
of water- and nonwater-dependent uses, and thereby protecting public trust rights in tidelands. Armstrong. 490 Mass. at 244, 248-49[4]. Pursuant to this authority, MassDEP has promulgated licensing regulations which restrict nonwater-dependent projects in tidelands, in order to ensure that such lands remain accessible t? the public and for water-dependent uses. See generally G.L. c. 91, § 2; Armstrong, 490 Mass. at 249; 310 Code Mass. Regs. §§ 9.01, 9.31, 9.51-55. 
            In 1972, Congress enacted the Coastal Zone Management Act, 16 U.S.C. § 1451, et. seq. ("the CZMA"), which declared a "national policy [ ] to preserve, protect, develop, and where possible, to restore or enhance the resources of the Nation's coastal zone." 16 U.S.C. § 1452(1). The CZMA was enacted "to encourage and assist the states to ... develop[ ] and implement[ ] [coastal zone] management programs ... [,] giving full consideration to ecological, cultural, historic, and esthetic values as well as the needs for compatible economic development." 16 U.S.C. § 1452(2).[5] Once the federal government approves a state's management plan, the state may obtain federal funding for coastal zone preservation and development, and may conduct "consistency reviews" to ensure that proposed development projects are consistent with the values set forth in 16 U.S.C. § 145!(2). See Fore River Residents Against Compressor Station v. Office of Coastal Zone Mgmt., 10q Mass. App. Ct. 556, 557-58 (2021), citing 16 U.S.C. §§ 1454, 1455, 1456b, 1456(c)(3)(A).[6]
 
--------------------------------------------
 
[4] "Tidelands" are "present and former submerged lands and tidal flats lying below the mean high water mark." G.L. c. 91, § l.
[5]"Coastal zone' refers to the coastal waters ... and the adjacent shorelands ...  in  proximity to  the  shorelines  of the several coastal states, and includes islands, transitional and intertidal areas, salt marshes,  wetlands, and  beaches.  The zone extends ... seaward to the outer limit of State title and ownership ... [and] inland from the shorelines only to the extent necessary to control shorelands, the uses of  which have  a  direct and  significant  impact on  the  coastal waters, and to control those geographical areas which are likely to be affected by or vulnerable to sea level rise." 16 U.S.C. § 1453(1).
[6] A state must provide plans to: (1) protect natural resources (wetlands, flood plains, beaches, barrier islands, coral reefs, wildlife); (2) minimize loss of life and property due to improper development of areas prone to flood, erosion, sea level rise, etc.; (3) improve, safeguard; and restore the quality of coastal waters; (4) prioritize coastal dependent
 
                                                            -3-
 
            In response to the CZMA, the former Executive Office of Environmental Affairs (now known as EOEEA and hereinafter collectively "EOEEA"), established the OCZM which, in turn, developed  the Commonwealth's first Coastal Zone Management ("CZM") Program. See 95 Mass. Reg. 1-122 (Feb. 24, 1978). (See also "Coastal Zone Management Program and Final Environmental Statement" (Mar. 3} 1978), Add. at 134, 688.) EOEEA tasked the OCZM to "[e]ncourage the location of maritime commerce and development in segments of the urban waterfronts designated as port areas [and,] [w]ithin these areas, prevent the exclusion of maritime dependent industrial uses that require the use of lands subject to tidelands licenses[.]" 95 Mass. Reg. 1-122, § 5.3(a)(7) (Feb. 24, 1978) (emphasis added). Thus, the initial CZM Program established 12 DPAs, including the East Boston DPA at issue, and provided that "Tidelands licensing, administered ;by the Waterways Program [MassDEP,]" would be "the principal means" of implementing the DPA policy." (See Add. at 81, 83, 172-79.) [7]
            In April, 1978, the federal government approved the Commonwealth's CZM Program the first of its kind on the eastern seaboard. See Ten Residents of Mass. v. Cape Wind Associates. LLC, No. BACV2009-00107, 2010 WL 11813795, at *5 (Mass. Super. Ct. Feb. 18, 2010) (Rufo, J.). MassDEP promulgated regulations adopting both OCZM's criteria for DPAs, fn.4, as well the 12 DPAs identified in the CZM Program. 115 Mass. Reg. 132 (July 20,
 
--------------------------------------------
 
uses, including national defense, energy, fisheries development, recreation, ports, transportation, and, to the maximum extent practicable, new commercial and industrial developments in or adjacent to areas where such development already exists; (5) promote public access for recreation; (6) restore deteriorating urban waterfronts; (7) expedite government decision making for management of coastal resources; (8) consult and coordinate with affected federal agencies; (9) notify the public and '1ocal government of opportunities to participate in coastal management decision-making; (10) conserve and manage living marine resources, and coordinate between State and Federal coastal zone management agencies and State and wildlife agencies; and (11) study and address the adverse effects of land subsidence and of sea level rise. 16 U.S.C. § 1452(2)(A-K).
[7] The CZM Program defined a designated “'port area" as lands with: (I) navigable channels of 20 foot depth or more; (2) tidelands or associated lands abutting such channels suitable for maritime dependent industrial use; (3) well developed road and rail links leading to major routes; and (4) water and sewer services capable of supporting maritime dependent industrial use. (Sec Add. at 81.)
 
                                                            -4-
!
 
1978); 130 Mass. Reg. 51 (Nov. 2, !1978). The MassDEP regulations provided that DPAs could be revised or added "upon the request of ... any city or town, or of any state agency ... sent to [MassDEP] and to the [OCZM]," b:Ut that any revision must comply with the regulations of the CZM Program. 115 Mass. Reg. 133. 
            In 1983, the Legislature amended EOEEA's enabling statute, G.L. c. 21A, formally establishing the OCZM and empowering it to develop "rules, regulations, procedures, standards, guidelines, and policies which shall' constitute the Massachusetts coastal zone management program" for "[t]he purpose of ...  secur[ing] ...  the objectives and benefits of the federal [CZMA]." St. 1983, c. 589, § 13; G.L. c. 21A, § 4A. Contemporaneously, the Legislature amended MassDEP's licensing authority under the Waterways Act to provide:
"No structures or fill for nonwater dependent uses of tidelands may be licensed unless a written determination by [MassDEP] is made following a public hearing that said structures or fill shall serve a proper public purpose and that said purpose shall provide a greater public benefit than public detriment to the rights of the public in said lands and that the determination is consistent with the policies of the Massachusetts coastal zone management program."
St. 1983, c. 589, § 26; G.L. c. 91, §; 18 (emphasis added).
            The Legislature also enacted the Coastal Facilities Improvement Act, G.L. c. 21F, to provide state funding to coastal cities and towns to "plan for, construct, reconstruct, maintain and improve public coastal facilities.[.]'l St. 1983, c. 5 9, §.19; G..L. c. 21F:§ l(b). he statute
identifies areas that may be eligible for state funding, including those ma "designated port area," defined as "any port area suitable for maritime-industrial uses and so designated in accordance with the procedures established by [ MassDEP] under [G.L. c. 91]." G.L. c. 21F, §§ 2, 5.
            In 1990, MassDEP promulgated regulations that carried forward the 12 established DPAs, as well as any such areas that "may be so designated or ... modified by [the OCZM]." 310 Code Mass. Regs.§ 9.02 (199Q); 638 Mass. Reg. 55 (July 6, 1990). Thereafter, the OCZM
 
                                                            -5-
 
promulgated regulations setting forth the procedures and criteria for establishing, reviewing and modifying DPA boundaries. Sec 301 Code Mass. Regs.§ 25.00, et seq. The two agencies have continued to govern DPAs under tills framework to the present day.[8]
            MassDEP states that its Tidelands or "Waterways" regulations "form part of the ... CZM Program," and that MassDEP seeks to interpret and apply the regulations "consistent with the polices of the CZM Program." 3IOiCode Mass Regs.§ 9.01. Specifically, "[n]onwater-dependent use projects located in a coastal zone [must] be consistent with all policies of the [CZM] Program[.]" 310 Code Mass. Regs.§ 9.54. If the property falls within a DPA, tidelands licenses are generally limited to certain water-dependent uses- viz., water-dependent industrial uses, supporting DPA uses, recreational boating, or pedestrian access. See 310 Code Mass. Regs§§ 9.15(d), 9.32(b). MassDEP may issue a variance from these requirements. 310 Code Mass. Regs. § 9.21. The Waterways regulations also specifically contemplate that the OCZM will offer input into MassDEP's licensing process there the proposed project implicates the coastal zone. See 310 Code Mass. Regs. § 9.11 (upon receipt of a project proposal, MassDEP "may invite representatives of [the OCZM], and other state agency, or ... municipality" to participate "in the pre-application consultation meeting''); 310 Code Mass. Regs. §§ 9.13(l)(a), 9.14 ("[A]pplicant shall send a notice of license or permit application ... to [the OCZM], if the project is located within the coastal zone" and "[u]pon issuance, [MassDEP] shall send a copy of the license, permit, or written determination to I... [the OCZM]."); 310 Code Mass. § 9.13(2) (listing instances in which the OCZM has right to participate in an adjudicatory hearing concerning a license application). "If [MassDEP] disagrees with any conclusions or recommendations of [the OCZM]," the Waterways regulations direct MassDEP to mediate the disagreement before the
 
--------------------------------------------
 
[8] The current MassDEP regulations simply define DPA as "an area that has been so designated by [OCZM] in accordance with 30 I C.M.R. 25.00[.]" 310 Code Mass. Regs. § 9.02.
 
                                                            -6-
 
Secretary of EOEEA. 310 Code Mass. Regs. § 9.54(2). If the disagreement cannot be resolved through mediation, MassDEP's written determination must explain the specific basis for its final decision in relation to the OCZM's policies. Id.
PROCEDURAL BACKGROUND[9]
            Plaintiffs purchased properties within the East Boston DPA after it was established in 1978. The properties arc, in whole or in part, subject to MassDEP tidelands licensing under G.L. c. 91, but there is no indication that any Plaintiff has ever applied for such a license.
            The East Boston DPA is comprised of five groups of properties or "planning units."[10] Plaintiffs' properties lie within the Border Street Central and Border Street South planning units.[11] In January, 2020, the City df Boston Planning and Development Agency requested that the OCZM review the East Boston DPA boundaries. The OCZM issued a notice of intent to review the boundaries on February10, 2021; held a public information meeting on February 23, 2021; and provided a three-month period for public comment. Thereafter, the OCZM reviewed submitted comments and met with state agency partners, city officials, property owners, and interested constituents.
            On December 15, 2021, the OCZM issued a Boundary Review Report. Consistent with its regulations, the OCZM applied1two-step review process for each planning unit to determine
 
--------------------------------------------
 
[9] Consistent with the standards of review for motions under Mass. R. Civ. P. 12(c) and 56, the within background summary sets forth undisputed facts, drawn from the parties' submissions and viewed in the light most favorable to the non-moving party, as well as facts of which the Court may properly take judicial notice. Jarosz v. Palmer, 436 Mass. 526, 529 (2002).
[10]See Boundary Review of East Boston DPA, at 14 (Dec. 15, 2021), available fil https://www.mass.gov/doc/boundary-review-of-the-east-boston-designated-port-arca-boston-ma/download; Boundary Review of East Boston DPA, at 4 (Dec. 18, 2002) available at https://www.mass.gov/doc/east-boston-dpa-boundary-review- 2002pdf/download;130 Mass. Reg. 51 (N v. 2, 1978).
[11] 266 Border LLC and 170 Border Street LLC each own a property in the Border Street Central planning unit. EBCBC, Inc. owns two properties (80 and' 102 Border St.), and Sixty Border Street, LLC owns one property in the Border Street South planning unit.
 
                                                            -7-
 
whether it should remain in the DPA. First, the OCZM determined whether each planning unit was eligible for review. Excluded 1om  review - and thus required to remain within the DPA - are planning units that have "consisted primarily of Water-Dependent Industrial Use throughout the previous five years[.]" 301 Code Mass. Regs.§ 25.03(2)(b). The OCZM found that the Border Street Central planning unit was thus "ineligible," because two water-dependent uses occupy nearly the entire shoreline of the planning unit, one of which has operated continuously during previous five years.[12] Additionally, an abutting property (a Shaw's supermarket) is licensed under MassDEP Tidelands License No. 6757 as a Supporting DPA use; this license requires Shaw's to provide an easement across its parking lot to ensure that the water-dependent industrial uses have access to Border Street.
            The second step of the process requires the OCZM to review eligible planning units for compliance with four criteria governing their suitability for water dependent use, all of which the unit must exhibit to remain in the DPA. Per this part of the review, the land area must:
"(a) include ... a shoreline that has been substantially developed with piers, wharves, bulkheads, or other structures that establish a functional connection with a water area;
(b) ... lie in reasonable proximity to: (1) established road or rail links leading to major trunk or arterial routes; and (2) water and sewer facilities capable of supporting general industrial use;
(c) ... exhibit a topography that is generally conducive to industrial use, or reasonably capable of becoming so ... ;and
(d) ... exhibit a use character that is predominately industrial or reasonably capable of becoming so[.]"
301 Code Mass. Regs.§ 25.04(2).
            The OCZM found that the Border Street South planning unit was eligible for review, but
 
--------------------------------------------
 
[12] C. White Marino, Inc. has operated various water-dependent barges, push boats, work skiffs, and the  like throughout the previous five years. The second entity is a vessel dismantling operation.
 
                                                            8
 
concluded that it must remain in the DPA because it met the four suitability criteria. The OCZM thus determined that a significant portion of the shoreline "features [the requisite] piers, wharves, bulkheads, and other structures[.]" Boundary Review 2021, at 9. Next, the planning unit is linked to major arteries, specifically Rout s 90 and 1A, and has sufficient water and sewer capacity to support industrial use. Finally, the OCZM found that the planning unit consisted of flat, low- level tidelands with commercial/industrial structures conducive to water-dependent industrial use.
            In response to this Boundary Review Report, the OCZM received and reviewed 79 written and oral comments, including comments that the Border Street Central planning unit should have been eligible for review, and that Plaintiff EBCBC, Inc.'s properties at 80 and 102 Border Street should be removed from the Border Street South planning unit. On December 23, 2022, the OCZM's Director, Lisa Berry Engler, issued a Designation Decision adopting the findings of the Boundary Review Report and addressing the foregoing comments. (See 266 Border Street LLC's Compl., Ex. . OCZM Decision). The Designation Decision noted that, even if the Border Street Central planning unit had been eligible for review, it would still remain in the DPA because it contains the requisite piers and/or other connections to the water; lies in reasonable proximity to Routes 90 Lid 1A; has sufficient water and sewer utilities; has suitable topography; and the character unit s industrial or capable of becoming so based on the water- dependent industrial uses, supporting DPA use, and the presence of industrial/commercial buildings.@..at 7-8.) As to the Bo der Street South planning unit, the Designation Decision emphasized that OCZM's regulations call for it to review DPAs and planning units as cohesive entities, not property-by-property, in order to preserve the finite areas that can support water- dependent uses, and that the "boundary review and regulatory framework" do not empower the
 
                                                            -9-
 
OCZM to "authorize any future us , specific redevelopment, or elements of future redevelopment - these matters are the subject of other jurisdictions, authorities, and review."Id at 9.)
DISCUSSION
            Plaintiffs seek declaratory relief under G.L. c. 23lA, § 1 via a ruling that the OCZM's boundary review was ultra vires, because the Legislature has invested MassDEP with exclusive authority over DPA boundaries. Plaintiffs also argue that the OCZM's regulations are so vague and arbitrary as to be unenforceable. Alternatively, Plaintiffs seek relief under G.L. c. 30A, § 14 (administrative appeal) and G.L. c1. 249,           § 4 (certiorari review), on the grounds that the OCZM's refusal to remove their properties from the East Boston DPA constituted an error of law, was arbitrary and capricious, and was unsupported by substantial evidence. The Court disagrees on all counts.
I. Declaratory Relief
            The Court "may on appropriate proceedings make binding declarations of right, duty, status and other legal relations . . “ G.L. c. 231A, § I. Absent an exclusive mode of review provided by law, a party may seek declaratory relief invalidating an agency's regulations if an actual controversy exists and the agency has failed to comply with its statutory mandate. See Entergy Nuclear Generation Co. v.,Department of Env't Prot., 459 Mass. 3I9, 324-25 (2011). Accord G.L. c. 30A, § 7. Plaintiffs have failed to demonstrate that these conditions are present here.
            The scope of agency authority is determined according to the "conventional tools of statutory interpretation." Armstrong, 490 Mass. at 247, quoting Goldberg v. Board of Health of Granby. 444 Mass. 627, 632 (2005). The reviewing court's principal objective "is to ascertain
 
                                                            -10-
 
and effectuate the intent of the Legislature in a way that is consonant with sound reason and common sense." Commonwealth v Wassilie. 482 Mass. 562,573 (2019). The statutory text is "the principal source of insight into; the legislative intent[.]" Navy Yard, 88 Mass. App. Ct. at 220, quoting Acme Laundry Co. C. Secretary of Env't Affairs. 410Mass. 760, 770 (1991). However, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Dert4iody v. Executive Off. of Health & Hum. Servs., 491 Mass. 223. 230 (2023) (quotations and citation omitted). The Court will not construe a statute so strictly or so literally as to produce a result that is illogical or plainly inconsistent with the Legislature's intent. See Ciani v. MacGrath, 481 Mass. 174, 178 (2019); Sullivan v. Brookline, 435 Mass. 353, 360 (2001).
            "Within the scope of its enabling legislation, [a] department has a wide range of discretion in establishing the parameters of its authority." Armstrong. 490 Mass. at 247 (internal quotation omitted). Because administrative agencies "enjoy[] broad authority to effectuate the purposes of the legislation," the Court "accord[s] substantial deference to [their] expertise and experience." Id. Such deference does not amount to abdication. but the Court will not overrule an agency's reasonable interpretations of its own rules and enabling statutes. Moot, 448 Mass. at 346 (2007).
            A. Ultra Vires
            Plaintiffs first argue that, by defining "designated port area" in the Coastal Facilities Investment Act as "any port area suitable for maritime-industrial uses and so designated in accordance with the procedures established by [MassDEP] under /G.L c. 9lf', G.L. c. 21F, § 2 (emphasis added), the Legislature unambiguously designated MassDEP as the sole arbiter of DPA boundaries. Plaintiffs' argument has surface appeal when the statutory text is read in
 
                                                            -11-
 
isolation; but the theory falters when this text is considered in the context of the broader legislative scheme and its history. As set forth above, the OCZM established the governing DPA criteria and the initial DPAs themselves when it developed the first CZM Program in 1978. This included the East Boston DPA, which has always included Plaintiffs' properties. In so doing, the OCZM explicitly stated that the DPAs would be enforced through MassDEP's tidelands licensing under G.L. c. 91. Following federal approval of its CZM Program, MassDEP adopted the same 12 DPAs and the same DPA criteria pursuant to its regulatory authority under G.L. c. 91, § 18. Plaintiffs' ultra vires argument requires the Court to conclude that, in passing the Coastal Facilities Improvement Act five years later, the Legislature intended to abandon the very framework that had originally established the DPAs themselves, and instead grant MassDEP exclusive and non-depletable authority over DPA boundaries - excluding OCZM from the process altogether. See Commonwealth v. Callahan, 440 Mass. 436, 440-41 (2003) ("When the Legislature enacts legislation" it is “presume[d] that the Legislature is aware of the prior state of the law"). The relevant statutes, read fairly together, simply will not support such a conclusion. 
            Read in proper context, the singular reference to DPAs in the Coastal Facilities Investment Act as areas "so designated in accordance with the procedures established by [MassDEP] under [G.L. c. 91]," G.L. c. 21F, § 2, is in fact entirely consistent with the historical facts of how DPAs were established: OCZM identified the DPAs, and MassDEP adopted and enforced the resulting boundaries through its G.L. c. 91 licensing authority. Conversely, the passive reference to DPAs relied upon by Plaintiffs for their argument stands in striking contrast to the language the Legislature more typically employs to grant exclusive power to draw
                                                            -12-
 
boundary lines. [13] The text "certain! does not unambiguously bar the agencies' approach" here, New England Power Generators Ass'n. Inc. v. Department of Env't Prot., 480 Mass. 398,405 (2018) (internal quotations omitted)' , as would be required for the Court to deem such an approach ultra vires. 
            Furthermore, the Coastal Facilities Improvement Act itself has a decidedly narrow scope; it provides funding for municipalities to develop coastal areas. See generally G.L. c. 21F. The statute uses the term "designated port area" only once, when discussing the eligibility requirements for such funding. See G.L. c. 21F, §§ 1, 5. When the Legislature passed the Coastal Facilities Improvement Act, however, it also enacted G.L. c. 21A, § 4A, which, rather than curtail or circumscribe the authority of the OCZM, established OCZM as a permanent executive agency with broad authority "to secure for the inhabitants of the commonwealth the objectives and benefits of the federal Coastal ,Zone Management Act." At the same time, the Legislature additionally amended MassDEP's enabling statute, G.L. c. 91, § 18. Once again, rather than directing MassDEP in terms to assert exclusive authority over DPA boundaries (as it could have if the legislative intent were to reframe the regulatory regime in such a manner), the amendment requires MassDEP to ensure that its licensing decisions arc "consistent with the policies of the Massachusetts [CZM] program." St. 1989, c. 589, § 26. If the Legislature intended to confine authority over DPAs to and within MassDEP, burying such a mandate in an obscure definition contained in the narrow, municipal funding law - as opposed to addressing it in
 
--------------------------------------------
 
13 Compare G.L. c. 40V, § 2, St. 1971, c. 1070 (providing as to the Housing Development (HD) Incentive Program, the Department of Housing and Community Development "may from time to time designate l or more areas ... as an HD Zone and take any and all actions necessary or appropriate to such a designation ... "); G.L. c. 23A, § 3G St. 2016, c. 219, § 7 ("[Economic Assistance Coordinating Council] may designate 1 or more areas as an economic target area ... in connection with an application ... under the federal Empowerment Zones and Enterprise Communities Program ... "); G.L. c. 147, § 18, St. 1992, c. 403, § 29 (in establishing local police stations for detaining female prisoners, "mayor or police commissioner may at any time designate additional stations, or may discontinue any stations so designated ....”).
 
                                                            -13-
 
contemporaneous amendments to the EOEEA's and MassDEP's enabling statutes themselves-would be a bizarre way to express such an important intention. It would also fly directly in the face of the General Court's concurrent legislative acts, which codified the OCZM and directed MassDEP to act in harmony with OCZM's policies. Such a strained interpretation of the statute rends the very fabric of a carefully crafted legislative scheme.
            Subsequent history, to borrow that oxymoronic locution, further undermines Plaintiffs' claims. Through successive iterations of OCZM's and MassDEP's regulations, the criteria and framework that these agencies used to establish the DPAs in 1978 have remained fundamentally unchanged. There is no indication   at, in the decades since the initial CZM Program and the 1983 enactments were adopted, either the Legislature or any court, agency or litigant has ever embraced the position Plaintiffs no           advance and urge upon the undersigned. Cf. U.S. Gypsum Co. v. Executive Off. of Env't Affd., 69 Mass. App. Ct. 243,250 (2007) (holding that the OCZM must include property in the DPA when it meets the designation standards). To the contrary, to the extent the Legislature's enactments have touched upon DPAs since 1983, they have acknowledged OCZM's role in the regulatory scheme. [14]
            All told, the combined weight of (I) the text of G.L. c. 21F, G.L. c. 21A, § 4, and G.L. c. 91, § 18; (2) the statutes' legislative history; (3) the agencies' consistent and decades-long adherence to the existing DPA framework; and (4) the Legislature's implicit approval of this widely prevailing practice prove cumulatively fatal to Plaintiffs' requests for a dramatic departure from this scheme via deci1aratory relief. See Navy Yard, 88 Mass. App. Ct. at 223
 
--------------------------------------------
 
[14] Sec Stat. 1996 c. 28, § 2 (allocating fun s"[f]or improvements to coastal facilities in designated and non- designated port areas, including those defined pursuant to [G.L. c. 21F] and 301 CMR 25.00 [the OCZM regulations for DPAs]"); Stat. 1997, c. 43, § 244 (removing "Plymouth Cordage Park" as a DPA "under 301 C.M.R. 25.00 and 310 C.M.R. 9"); Stat. 2007 c. 168, § 4 ( defining "[l]andlocked tidelands" to include "any designated port area under the Massachusetts coastal zone management program").
 
                                                            -14-
 
("That the Legislature did not act to challenge the agency's regulations lends weight to the conclusion that the agency acted within its delegated authority in promulgating them."). The Court simply cannot conclude that G.L. c. 21F, § 2 dictates that MassDEP exercise exclusive authority to set and modify DPAs, 6r that MassDEP's/OCZM's prevailing framework for DPAs represents an unreasonable interpretation of the applicable statutes.
            Plaintiffs' contrary reliance on Armstrong and Moot is misplaced. In Armstrong, the Supreme Judicial Court (SJC) invalidated MassDEP regulations that permitted the Secretary of EOEEA to effectively overrule MassDEP's tidelands licensing decisions concerning municipal harbor plans. 490 Mass. at 251. And in Moot, the SJC held that MassDEP could not categorically exclude "landlocked tidelands" from its licensing review. 448 Mass. at 351-52.[15] In both cases, the SJC concluded that MassDEP had impermissibly abandoned its public trust duty by excluding a "category of projects from  its purview," ... "effectively relinquish[ing] public rights that the Legislature []  mandated bd preserved through the licensing requirements of G. L. c. 91, § 18.'' Armstrong, 490 Mass. at 25 , quoting Moot, 448 Mass. at 350. No remotely comparable circumstances are present here. Chapter 91, § 18 explicitly directs MassDEP to act in comity with the OCZM. This is necessary because, if MassDEP were to license projects in a coastal zone without regard for the CZM Program, it would jeopardize federal funding and the continued existence of the very industrial port areas the OCZM was established to safeguard. in contrast to Armstrong and Moot, the DPA framework Plaintiffs challenge does not exclude properties from MassDEP's purview but, instead, identifies areas subject to more stringent scrutiny and protection. By the same token, and again in contrast to the cases upon which Plaintiffs rely, MassDEP retains final authority over both the tidelands licenses issued to properties within
--------------------------------------------
 
[15] The Legislature subsequently amended .L. c. 9I, § 18 to exempt landlocked tidelands. Sec St. 2007, c. 168, § 7; Moot v. Department of Env’t. Prat., 456 Mass. 309,314 (2010).
 
                                                            -15-
 
DPAs and the scope of any development permitted thereunder. Sec 310 Code Mass. Regs. §§ 9.21, 9.32(b)(l), 9.54.[16] In this way, MassDEP and OCZM have not failed to comply with their statutory mandates, rendering Armstrong and Moot inapposite.
            Plaintiffs have also failed to demonstrate an actual controversy appropriate for declaratory relief. "An actual contr6versy exists where there is a real dispute ... in circumstances indicating that failure to resolve the conflict will almost inevitably lead to litigation.... Questions of statutory interpretation, by themselves, do not rise to the level of actual controversy." Entergy, 459 Mass. at 325. Plaintiffs do not contest that the OCZM and MassDEP properly established the East Boston DPA in 1978, before Plaintiffs purchased their properties within the designated area. Thus, even if the Court invalidated the OCZM's Designation Decision as ultra vires, the result would be the same: Plaintiffs' properties would lie within the East Boston DPA under the previously established boundaries. Moreover, the OCZM's boundary decision does not actually determine the scope of Plaintiffs' rights to use their properties which, it is apparent, is the true gravamen bf their present claims. MassDEP determines those rights through tidelands licensing, which plaintiffs have apparently never sought. Finally, despite Plaintiffs' insistence that their properties have been deprived of all use and value, it appears that MassDEP in fact permits a broad spectrum of property uses within DPAs.[17] Therefore, even if
 
--------------------------------------------
 
[16] OCZM "docs not control or govern  all land  uses within  port areas," but  merely  seeks to  provide "unified  criteria and guidelines for state issuance of tidelands licenses and other state or federal permits required in siting a particular project within a coastal zone or port." Creekside Parking. Inc.v. Chelsea, No. 192808, 1994 WL 16193975, at *S (Mass. Land Ct. July 29, 1994) (Scheier, 1;).
[17] See OCZM Boundary Review Report, at 5 (noting that Border Street Central planning unit "includes a mix of ownership and uses," including Wigglesworth Machinery, Shaw's supermarket, Kappy's Liquors, Marshalls, and McDonald's). See also Boston Edison Co. v. Mass. Water Res. Auth., 459 Mass. 724, 737-38 (2011) (recounting testimony of former chief of MassDEP's waterways licensing program that MassDEP had permitted residential uses as "supporting DPA use[s]," and that MassDEP has a policy of "flexible protectionism," allowing licensing consideration "where there is reasonable evidence [that] preserving these waterfront areas for future water- dependent industrial uses [would be] either impractical or unlikely.").
 
                                                            -16-
 
the Court were inclined to agree that MassDEP had impermissibly delegated authority to the OCZM - which the undersigned is not - principles of judicial restraint would require that MassDEP be permitted to determine Plaintiffs' rights in the first instance pursuant to G.L. c. 91, § 18. See Massachusetts Gen. Hosp. v. C.R., 484 Mass. 472,488 (2020) (courts should not  invalidate a statute or "decide constitutional questions unnecessarily or prematurely"); Fernandes v. Attleboro Hous. Auth., 470 Mast 117, 121 (2014) (where the Legislature has committed a particular issue to an agency's decision-making, a court should "refer the issue to the agency for adjudication in the first instance"). I
            B. Vagueness
            Plaintiffs next argue that the OCZM's treatment of planning units and its failure to consider the character of properties' abutting the DPA is so vague and arbitrary as to be unenforceable. The Court does not agree.
            This Court's reasoning in 2 5 and 257 Marginal Street, LLC v. Executive Off. of Energy and Env't Affs., No. 1673CV0146i, 2017 WL 7691717, at *3-5 (Mass. Super. Ct. June 27, 2017), rejecting a similar challenge to the OCZM's DPA regulations, is persuasive. As the Court (Ames, J.) held, ''in view of the fact that [the OCZM] must evaluate coastal areas on a case-by- case basis, the regulations could not possibly address all of the potential configurations that may be suitable for inclusion within a DPA." Id. Thus, the OCZM is not required to forego planning units and consider each property in isolation. Id. Rather, the regulations "set forth specific criteria governing (1) whether a coastal area is eligible for review, ... and (2) what factors [the OCZM] must consider to determine whether an area can accommodate water-dependent industrial use[.]" Id. at *3 (emphasis added), citing 301 Code Mass. Regs. §§ 25.03(2), 25.04; Brookline v. Commissioner of Dep't of Env't Eng'g, 387 Mass. 372, 379 (1982) (precise
 
                                                            -17-
 
articulation of objective standard not required where application best determined on case-by-case basis). The OCZM may reasonably consider whether a unit of properties merits inclusion in a DPA and furthers the goals of the CZM  Program and, in so doing, may include properties that, individually, are not dedicated to a water-dependent industrial use. See Marginal Street, WL 7691717, at *3. At the same time, A is reasonable for the OCZM to decide that its boundary decisions will not be dictated by the character of properties adjacent to or abutting a planning unit. Doing so would undermine a fundamental purpose of the CZM Program by allowing "non- industrial or nonwater-dependent types of development, which enjoy a far greater range of locational options," to erode "the scarce and non-renewable resources of the marine economy" that the OCZM exists to protect. 3q'l Code Mass. Regs. § 25.01(2).
            In accordance with the foregoing, the Court shall enter summary judgment for the Defendant on Plaintiffs claims for declaratory judgment challenging the legality of the OZCM and MassDEP regulations related to DPAs.
II. Judicial Review, G.L. c. 30A, § 14
            Judicial review under G.L. c. 30A, § 14 is available to any person "aggrieved by a final decision of any agency in an adjudicatory proceeding." "[An] 'adjudicatory proceeding'  means a proceeding before an agency in which the legal rights, duties, or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing." G.L. c. 30A, § 1. See Fore River, 100 Mass. App. Ct at 560-61 Judicial review not available under § 14 unless the party has a right to a hearing to adjudicate its interests). f' f a decision was not made in an adjudicatory proceeding, the Court lacks jurisdiction to review it under G.L. c. 30A, § 14. School Comm. of  Hudson v. Board of Educ., 448 Mass. 565,577 (2007).
 
                                                            -18-
 
            In the case at bar, the record is plain that, while OCZM's review of the East Boston DPA entailed notice and comment and a public hearing, see 301 Code Mass. Regs. § 25.03(5), it did not include an adjudicatory proceeding within the meaning of G.L. c. 30A, § 14. See Sierra Club v. Commissioner of Dep't of Env't Mgmt., 439 Mass. 738, 747-48 (2003) (holding hearing for "public comment and public scrutiny of agency action ... implementing the legislative policy" is non-adjudicatory); Ten Residents, 2010 WL 11813795, at *11, citing Hudson, 448 Mass. at 577- 78; Sierra Club, 439 Mass. at 747 G'[A] hearing held to allow public input and scrutiny of administrative action does not render an agency process adjudicatory, where the hearing is not adversarial in nature and there is n6: requirement that the agency take formal testimony, hear or cross-examine witnesses, or assess the credibility of any information submitted."). Plaintiffs have not cited any statutory or constitutional provision entitling them to a hearing to adjudicate any of their rights related to DPA boundary review. See Fore River. 100 Mass. App. Ct. at 561 (holding plaintiff not entitled to judicial review of the OCZM's finding that federal project was consistent with CZM Program).[18] Compare 310 Code Mass. Regs. § 9.17 (providing a "right to an adjudicatory hearing concerning a decision by [MassDEP] to grant or deny a license or permit"). Defendant is thus entitled to judgment on Plaintiffs' claims for relief under G.L. c. 30. § 14.
III. Certiorari Review, G.L. cl249, § 4
            To obtain certiorari review of an administrative decision, a party must show: "(1) a judicial or quasi judicial proceeding, (2) from which there is no other reasonably adequate remedy, and (3) a substantial injury or injustice arising from the proceeding under review."
 
--------------------------------------------
 
[18] Plaintiffs cite U.S. Gypsum, in which the Appeals Court reviewed a DPA boundary designation by OCZM under the substantial evidence standard associated with G.L. c. 30, § 14. However, the Appeals Court expressly noted that it did so only because no party had contested the appropriateness of that standard on appeal. 69 Mass. App. Ct. 243, 247 n.13. Because U.S. Gypsum did not actually decide that G.L. c. 30, §14 review is appropriate, and Fore River (in the analogous context of the OCZM's federal consistency review) subsequently held that it is not, the Court today concludes that Fore River and not U.S. Gypsum is the applicable precedent.
 
                                                            -19-
 
Emma v. Massachusetts Parole Bd. 488 Mass. 449, 453 (2021).
            To determine whether the underlying proceeding was judicial or quasi judicial, the Court considers "the extent to which it resembles judicial action." Fore River, 100 Mass. App. Ct. at 561.  Relevant factors are: 
"(1) whether the proceeding is preceded by specific charges; (2) whether the proceeding involves sworn testimony by witnesses subject to cross-examination, or a party attesting to certain facts, as opposed:10 unsworn statements by interested persons advocating for or against a proposed new policy; (3) whether the agency conducts an investigation into the veracity of attested-to facts; (4) whether the proceeding culminates in an individualized determination of a party's entitlement to some benefit, or an individualized course of discipline, as opposed to culminating in the adoption of a rule of general applicability; and (5) whether the proceeding is followed by the adoption of formal findings of fact."
Id. at 561-62, quoting Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 600-01 (2017). Here, the OCZM's boundary review, was not preceded by any specific charges. It did not involve sworn testimony or cross-examination of witnesses, an adversarial proceeding, or a specific investigation into the veracity of attested-to facts. The OCZM performed a generalized assessment of the East Boston DP4, accepted (unsworn) public comment, and met informally with interested parties. The OCZM ultimately issued a report and "Designation Decision" that applied its regulatory criteria, but this does not amount to a judicial or quasi-judicial proceeding. The OCZM did not assess the credibility of witnesses, weigh evidence, or preform any of the formal fact-finding associated with a judicial action. Most notably, the process did not culminate in an individualized determination of Plaintiffs' rights. Fore River, 100 Mass. App. Ct. at 561. OCZM is simply not a licensing or permitting agency and, as noted supra, its regulations do not provide for individualized property assessments.[19]
            Plaintiffs also have an adequate remedy to vindicate their property rights - viz., the
 
--------------------------------------------
 
[19] For these reasons, this case is readily distinguishable from Garrity v. Conservation Comm'n of Hingham. 462 Mass. 779 (2012), cited in the parties' briefs, which permitted certiorari review for the town commission's final denial of the plaintiffs request to construct a pier.
 
                                                            -20-
 
MassDEP licensing process, which includes the right to an adjudicatory proceeding, testimony from sworn witnesses subject to cross-examination, formal inquiry and fact-finding, and an individualized determination of their property rights. These factors once again militate in favor of the dismissal of Plaintiffs' claims, allowing MassDEP instead to render judgment in the first instance (which may then be subject to G.L. c. 30A review). See Marion v. Massachusetts Hous. Fin. Agency. 68 Mass. App. Ct. 208, 210-12 (2007) (dismissing certiorari petition, because determination that housing project  as   eligible for funding was an interim step that did not automatically secure comprehensive permit; permit was subject to final decision of Housing Appeals Committee and subsequent review under G.L. c. 30A).
            Licensing tidelands develo1ment involves an intricate balancing of competing public interests in economic development) recreation, flood mitigation, control of soil erosion, wildlife protection, and environmental preservation. See 310 Code Mass. Regs. § 9.0I(2). The Legislature has expressly entrusted MassDEP with this complex and highly technical decisional balancing. G.L. c. 91, § 18. As such, "the doctrine of primary jurisdiction requires [Mass]DEP to undertake the review of any proposal [to develop tidelands] in the first instance." Landing Grp. Inc. v. Department of Env't Prot.. 3 Mass. App. Ct. 788, 791 (2018). See also Walpole v. Secretary of the Exec. Off. of Env't Affs., 405 Mass. 67, 72 (1989) ("Allowing the completion of the administrative process before permitting judicial review gives the [agency] a full and fair opportunity to apply [its] expertise to the statutory scheme which, by law, [it] has the primary responsibility of enforcing.").
            Finally, the inclusion of Plaintiffs' properties within the DPA does not constitute a substantial injury justifying certiorari review. The OCZM's decision does not impact Plaintiffs' property rights except as to Plaintiff’s' burden before MassDEP. if and when they choose to
 
                                                            -21-
 
pursue tidelands licensure. MassDEP's licensing decisions are not dictated by the DPA boundaries, and this Court will not, presume as much where Plaintiffs have never petitioned MassDEP for review. See Marion, supra.
CONCLUSION AND ORDER
            For all the foregoing reasons, the Plaintiffs' Motions for Judgment on the Pleadings and Summary Judgment are DENIED, the Defendant's Cross-Motions for Judgment on the Pleadings are ALLOWED, and summary judgment is hereby ENTERED for the Defendant on Plaintiff's claims for declaratory judgment.
SO ORDERED.